**JOE FLYNN RARE COINS INC., et al., Plaintiffs,**

v.

**Robert T. STEPHAN, et al., Defendants.**

Civ. A. No. 81–2182.

United States District Court,
D. Kansas.

Dec. 3, 1981.

Donald W. Vasos, Scott, Daily & Vasos, Kansas City, Kan., for plaintiffs.

Robert T. Stephan, Atty. Gen., James E. Flory, Asst. Atty. Gen., Topeka, Kan., Nick A. Tomasic, Wyandotte County Dist. Atty., Kansas City, Kan., Philip S. Harness, Asst. County Counselor, Lyndus A. Henry, County Counselor, Olathe, Kan., Neil R. Shortlidge and James L. Robinson, Overland Park, Kan., for defendants.

## MEMORANDUM AND ORDER

SAFFELS, District Judge.

This matter comes before the Court upon plaintiffs' request for a declaratory judgment and a permanent injunction against the enforcement of Substitute for House Bill 2119, [hereinafter "The Precious Metals Dealers Act" or "the Act"], which became effective as law July 1, 1981. Also pending before the Court are two motions to dismiss by the defendants representing Kansas City, Kansas, and Overland Park, Kansas. The parties have fully briefed the issues and have indicated that the case is ready for ruling on the issues of the declaratory judgment and the permanent injunction.

Plaintiffs are two precious metals dealers in their individual and corporate capacities. Plaintiff Joe Flynn is a coin dealer who owns and operates Joe Flynn Rare Coins, Inc., which deals in both rare coins and precious metals in Kansas City, Kansas. Plaintiff Fred Sweeney is a rare coin dealer in Overland Park, Kansas. He is the sole shareholder in both plaintiff U. S. Precious Metals, Inc. and Fred Sweeney Rare Coins, Inc. Defendants are the state officials, the county officials of Wyandotte and Johnson Counties, Kansas, and the city officials of Kansas City, Kansas, and Overland Park, Kansas, who would enforce the Precious Metals Dealers Act against these plaintiffs.

On June 30, 1981, plaintiffs filed this action and obtained a temporary restraining order prohibiting defendants from enforcing against plaintiffs the provisions of the Precious Metals Dealers Act. Following a hearing on July 10, 1981, this Court entered a preliminary injunction under the same terms as the temporary restraining order.

## REGULATION OF PRECIOUS METALS DEALERS

We must first consider plaintiffs' allegations that the State may not regulate the purchase and sale of precious metals. First, plaintiffs assert that arbitrary and unreasonable limitations on the conduct of a lawful business are unconstitutional. Second, they challenge the State's exercise of power in an area they allege has been pre-empted by federal statute.

In support of their first argument, plaintiffs rely upon Gilbert v. Mathews, 186 Kan. 672, 352 P.2d 58 (1960). In that case, the validity of the "New Goods Public Auction Law" was attacked by an action for declaratory judgment. Plaintiff, an itinerant auctioneer selling new goods, did not apply or obtain a license as required by the Act. The Kansas Supreme Court held the Act unconstitutional, stating:

"It places arbitrary and unreasonable limitations, regulations and impositions on the conduct of a lawful business, and is designed to be so oppressive and unreasonable that it prohibits the conduct of such lawful business."

186 Kan. at 686, 352 P.2d at 69.

The Gilbert court found that the bond requirements on auctioneers violated the equal protection clause and that the personal property tax provisions were ambiguous. As a result, the "poorly and awkwardly drawn act ... was designed to be so oppressive and unreasonable that no applicant could comply with its terms." 186 Kan. at 683, 352 P.2d at 68.

This case is distinguishable from the case at hand in that the Kansas Supreme Court specifically found the purpose of the unconstitutional act was not to regulate but to prohibit legitimate business. We find that precious metals dealers are able to comply with the provisions of the Precious Metals Dealers Act as written. The Act is not designed to prohibit the sale of precious metals, but merely to regulate those entities that deal in precious metals.

We must begin our analysis of plaintiffs' argument that the Act is an unreasonable limitation on a lawful business by considering the question of whether the regulation of precious metal dealers is an act within the State's police power. If the act is within the police power, then we must determine if it is "unequal, unreasonable and oppressive legislation or that which is in violation of the fundamental law." *Gilbert v. Mathews*, 186 Kan. at 677, 352 P.2d at 64. The *Gilbert* case provides a "mini-treatise" in the area of the exercise of the police power:

"... This court has repeatedly held that the police power of the state extends not only to the protection of the public health, safety and morals, but also to the preservation and promotion of the public welfare....

"It is settled that a state must exercise its police power subject to constitutional inhibitions....

\*     \*     \*     \*     \*     \*

"By constitutional provisions all men are possessed of equal and inalienable natural rights, among which are life, liberty and the pursuit of happiness, and no distinction shall ever be made between citizens of the State of Kansas and the citizens of other states and territories of the United States in respect to the purchase, enjoyment or descent of property. (Kansas Constitution, Bill of Rights, §§ 1 and 17.) The Federal Constitution safeguards the citizens from state legislation which abridges his privileges and immunities or denies him the equal protection of the laws or deprives him of liberty or property without due process of law. (Constitution of the United States, Amend. 14, § 1.)"

186 Kan. at 676–677, 352 P.2d at 63–64.

Kansas has long recognized the need to exercise its police power in the regulation of pawnbrokers. In *City of Wichita v. Wolkow*, 110 Kan. 127, 202 P. 632 (1921), the Kansas Supreme Court considered whether an ordinance of the City of Wichita requiring pawnbrokers and secondhand dealers to keep a registry of merchandise purchased and to deliver the register to the police department was unconstitutional. The Kansas court stated:

"It has become recognized by the business world and by the courts that pawnbrokers and secondhand dealers have occasion to deal with so many who have small regard for the criminal law and are actual receivers of stolen goods that for the benefit of the public somewhat severe restrictions are justified....

\*     \*     \*     \*     \*     \*

"While the requirements of this ordinance may work considerable inconvenience to those engaged in secondhand business, the good intended to be accomplished is so manifest that the court does not feel authorized to declare the ordinance arbitrary or unreasonable. The changing needs of advancing civilization, as well as the growing acuteness and sagacity of those fatally bent on mischief alike require more legislative restrictions than may have been necessary in more simple times. All citizens within reasonable limits must help bear the burden that present conditions make requisite for the public welfare.

" 'Dealers in junk and secondhand articles are subject to rigid control and regulations for several reasons. First, like pawnbrokers, they are constantly receiving stolen goods, either innocently or otherwise. Second, they are very apt to gather together a mass of inflammable matter in combustible buildings. Third, they frequently have in their possession clothing and other articles infected with disease.' (19 R.C.L. 862.)

"When property is stolen for the purpose of disposition, the guilty party who sells it can find so many methods of evading and avoiding detection and arrest that for the sake of property owners and for the enforcement of criminal law those whose business naturally and necessarily includes transactions with such lawless persons may reasonably be required to use the safeguards provided by this ordinance, and by so doing they are not de-

prived of any right vouchsafed to them under the state or federal constitution." 110 Kan. at 128, 129, 202 P. at 634.

It is apparent that, in amending the statutes regulating pawnbrokers, the Kansas Legislature sought to restrict the flow of stolen goods through legitimate businesses to untraceable buyers. Plaintiffs' contention that pawnbrokers and precious metal dealers are distinguishable misses the target. It is not the end result, but the beginning of the transaction that provides the similarity between the two businesses—that is, both provide a marketplace for stolen goods. Therefore, the Court finds, as a whole, there is nothing repugnant about an act regulating the precious metal industry as an exercise of the police power.

Plaintiffs' further challenge to the power of the State to regulate the purchase and sale of precious metals requires little discussion. Plaintiffs assert that this area has been pre-empted by Congress in enacting Public Law 93–373 (93rd Cong., 5.2665, 88 Stat. 445), which provides in pertinent part:

"Sec. 2. Subsections 3(b) and (c) of Public Law 93–110 (87 Stat. 352) are repealed and in lieu thereof add the following:

"(b) No provision of any law in effect on the date of enactment of this Act, and no rule, regulation, or order in effect on the date subsections (a) and (b) become effective may be construed to prohibit any person from purchasing, holding, selling, or otherwise dealing with gold in the United States or abroad."

Plaintiffs' argument on this issue is not persuasive. In *Ray v. Atlantic Richfield Co.*, 435 U.S. 151, 98 S.Ct. 988, 55

L.Ed.2d 179 (1978), the United States Supreme Court stated:

"The Court's prior cases indicate that when a State's exercise of its police power is challenged under the Supremacy Clause, 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 [67 S.Ct. 1146, 1152, 91 L.Ed. 1447] (1947); *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 [97 S.Ct. 1305, 1309, 51 L.Ed.2d 604] (1977)...."

435 U.S. at 157, 98 S.Ct. at 994.

A state statute will fall if it is in direct conflict with national legislation [*see generally, Alabama State Federation of Labor v. McAdory*, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725 (1945)], or the United States has clearly pre-empted a given field [*see Florida Lime & Avocado Growers v. Paul*, 373 U.S. 132, 83 S.Ct. 1210, 10 L.Ed.2d 248 (1963)], or state law obstructs the execution of the full purpose and objectives of Congress [*Jones v. Rath Packing Co.*, 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977)]. Here, none of those considerations are present. The Act does not prohibit the holding, selling or otherwise dealing with gold. The Act merely regulates those persons or entities which engage in the sale of precious metals, of which one is gold. Further, there is no indication the Congress has pre-empted the field of regulating the sale of precious metals dealers. While the legislative history of Public Law 93–373 is sketchy, it is clear that the right to private gold ownership was not passed as a major statement of congressional policy in the field.[1] Finally, the Precious Metals Dealers

---

1. The right to private ownership of gold provision was added to Public Law 93–373, an Amendment to the International Development Association Act of 1960. Public Law 93–373 sought to increase the participation of the United States in the International Development Association. The dissenting views reveal that private gold ownership was "lagniappe" added to the bill to ensure its enactment. Congressmen Henry B. Gonzalez and Robert G. Stephens, Jr., stated:

"Nobody has ever asked for a hearing on the merits of private gold ownership. Instead the advocates of repeal have concentrated on tacking this issue on to other bills: first, the Par Value Act, then the Coinage Act, and today the International Development Association Act.

"There may be merit in authorizing private gold ownership. Whether there is or not, it is a subject that has absolutely nothing to do with IDA, and ought not be a part of this bill.

Act does not obstruct the purpose of Congress in allowing citizens of the United States to hold and trade gold. That is, the Act does not prohibit; it regulates. Therefore, we find no interface between the federal and state acts which would require the state to defer to the federal authority.

Accordingly, we hold that the regulation of precious metals dealers in itself is not a violation of plaintiffs' federal constitutional rights.

Plaintiffs, however, have further challenged individual areas as a violation of their constitutional rights. We shall consider each alleged infirmity separately.

## VAGUENESS AND OVERBREADTH

■ Plaintiffs allege generally that the Precious Metals Dealers Act is unconstitutional because it is vague and overbroad. Specifically, they object to the wording of the Act in §§ 1(c), 2, 4, 5(a) and 8. A brief description of each of these sections will be helpful for comprehension of the discussion.

Section 1(c) provides the definition of precious metals:

"Nobody really knows the consequences of this gold ownership provision; apparently no one cares to ask, preferring to concentrate on clever maneuvers than sound legislative procedure. This despite the fact that neither the Secretary of the Treasury, nor Chairman of the Federal Reserve Board, thinks it wise to set a date certain for repeal of the gold restrictions. And this despite the fact that present law allows the President to lift these restrictions at any time. Last year we were told that it would be unwise to repeal our gold statutes as long as the place of gold in the international monetary system remains an unsettled issue. It is still an unsettled issue—more unsettled today than a year ago, with the new agreement that allows countries to put their monetary gold up as collateral on loans intended to bail Italy and others out of problems generated by oil costs.

"In the name of leveraging a few votes for IDA, the Committee would thus recommend that we unilaterally change the laws restricting private ownership of gold. This flies in the face of the official recommendations that we have available. Privately, advocates of this action have assurances that everything is going to be all right; but where is the official of the Executive who is willing to make an official statement endorsing this ploy?

" 'Precious metal' means gold, silver or platinum group metals or any used articles or other used personal property containing such metals, but shall not include coins purchased for their numismatic value rather than their metal content or ingots or other industrial residue or by-products composed of such metals purchased from manufacturing firms."

Section 2 requires precious metal dealers to obtain a license to engage or continue in business as a precious metal dealer. An applicant for a license is required by § 2(b)(2) to submit with his application "a detailed inventory and description of all goods, wares, merchandise, precious metals or other property held in pledge or for sale at the time of the application."

Section 4 provides that a licensee must keep "such books, accounts and records" as will enable the license-issuing entity to determine whether the license is complying with the Act. Further, a city may examine "the books, accounts, records and files" used by the business; however, the representatives of the city or county shall have free

U.S.Code Cong. & Adm.News, Vol. 2, pp. 4030, 4046–47 (1974).

And further, Congressmen John H. Rousselot and John B. Conlan stated:

"The only difference between this bill and the one defeated in January is that this bill contains, in addition to an authorization of $1.5 billion for IDA, a section which would permit American citizens to own gold by the end of this calendar year. This provision was added because supporters of IDA were afraid she would be harmed if they sent her into the Congressional woods without gilt-edged security.

\*   \*   \*   \*   \*   \*

"It is instructive to note that even the sponsors of the gold amendment in the Senate, Senators Dominick and McClure, who had tacked a similar provision onto the Senate-passed IDA bill, voted against the bill on final passage. Those of us in the House who believe that Americans should be permitted to own gold can accomplish this objective through separate legislation amending P.L. 93–110. In addition, present provisions of P.L. 33–110 allow the President, by administrative action, to restore this right to Americans."

*Id.* at 4050.

access to "all such books, accounts, papers, records, files, safes and vaults."

Section 5 requires the filing of a weekly report of "all property received in pledge or purchased as a pawnbroker or precious metal dealer."

Section 8 requires each dealer to admit law enforcement officers to examine any "goods, articles, things, pledges, pawns, books, or other records on the premises; and to search for and to take into possession any article known or believed by such officer to have been stolen."

Plaintiffs argue that these terms are ambiguous and overbroad. While we would agree that some of the language in the statute is less than desireable, we do not find that the terms are so contradictory or ambiguous to require plaintiffs "to guess, at their peril, as to the meaning and application of the statute." It is clear that §§ 2 and 5 concern property that is held in pledge or purchased to sell by the pawnbroker or precious metal dealer. These sections are necessarily broad because they apply to both precious metal dealers and pawnbrokers who receive property which can only be described by collective, generic nouns. The modifiers "held in pledge or for sale" and "received in pledge or purchased" adequately define the class of property to be reported. Plaintiffs' arguments concerning the word "detailed" and examples of property which is not purchased from manufacturing firms are without merit and do not warrant discussion here.

## HOLDING PERIOD

Plaintiffs specifically attacked the constitutionality of the ten-day holding period required by § 5(d). That section provides:

"(d) Every precious metal dealer shall retain in the dealer's possession for a period of 10 days all precious metal purchased as a precious metal dealer, and such metal shall remain in the condition in which it was purchased. The ten-day period shall commence on the date that the appropriate police chief or sheriff receives the report of its acquisition in compliance with this section. If the police chief or sheriff has probable cause to believe that any precious metal reported by a dealer has been stolen, the police chief or sheriff may give written notice to the dealer to retain such metal for an additional period of 15 days. Upon such notice, the dealer shall retain such metal in an unaltered condition for the additional fifteen-day period unless the police chief or sheriff notifies the dealer in writing that the waiting period is terminated at an earlier time."

Plaintiffs assert that this section violates their due process and equal protection rights under the Fourteenth Amendment and places an impermissible burden on interstate commerce.

## DUE PROCESS

■ Plaintiffs' due process argument centers on their assertion that the ten-day holding period constitutes a "taking" of their property by the state. In *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922), the United States Supreme Court set out the general rule:

"... while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking...."

260 U.S. at 415, 43 S.Ct. at 160.

Generally, a taking occurs when the government asserts a proprietary interest in property [*Mugler v. Kansas*, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887)], or diminishes the value of the affected property [*Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922)]. In the case *sub judice*, these conditions are absent.

Our previous discussion concerning the police power of the State establishes the propriety of the State's exercise of the power in this area. The requirement of a holding period is fundamental to the purpose of the Act, i. e., to restrain the flow of stolen goods. The precious metals dealers, through their own testimony, established that the metal items purchased are easily-transported, goods. While none of the plaintiffs have smeltering units on their premises, the goods are rapidly transported out of the state to buyers who do have

smeltering devices. Thus, the individual goods can quickly be altered to the point that they are not traceable. As a result, the holding period is necessary to prevent the loss of stolen goods. During the holding period, the metals remain in the possession of the owner, and he is free to alienate the property as long as he retains possession of the goods for the ten-day holding period. It is clear that the State exercises no proprietary interest in the precious metals. Absent the assertion of a proprietary interest in the precious metals, we find that the State's regulation does not go so far as to constitute a taking in violation of the Fifth and Fourteenth Amendments.

Further, any diminution of value in the goods is speculative. In a declining market, the value could diminish. In a rising market, the dealer will benefit from the ten-day holding period. Therefore, we cannot say that the act of the State necessarily diminishes the value of the property.

Plaintiffs have failed to meet their burden to show that a "taking" has occurred. Absent a "taking," no basis remains for plaintiffs' due process argument.

We would comment at this juncture that no evidence was presented which would contradict plaintiffs' evidence that this legislation will require greater expenses and changes in their mode of operation. However, it is axiomatic that regulation requires additional costs to the regulated, which must either be passed to consumers or paid out of the regulated's profit margin. Adding costs to the price of doing business does not violate the Due Process Clause of the Fifth and Fourteenth Amendments.

EQUAL PROTECTION

■ Plaintiffs argue that the Act violates their rights to equal protection under the Fourteenth Amendment in that the State will not enforce the Act against jewelry stores, antique dealers, artisans, camera and film stores, or banks and other establishments which purchase products containing "precious metals." We agree with defendants that these are speculative arguments and that if any business or person fits within the definition of a "precious

metal dealer," then it must be presumed the act will be enforced as to them.

Plaintiffs further lament that used car dealers are not precluded from selling used cars (a frequently stolen item) within ten days of purchase. This argument raises an equal protection issue as to other classes of merchants who buy and sell used goods.

Analysis of an equal protection issue requires that the Court first determine which standard of review is applicable. The law is clear that in the areas of economics and social welfare, the acts of the State need only a reasonable basis. In *Dandridge v. Williams*, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the United States Supreme Court held:

> "In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78 [31 S.Ct. 337, 340, 55 L.Ed. 369] . . . ."

*Id.* at 485, 90 S.Ct. at 1161.

Here, the opportunity to halt the flow of stolen goods provides a reasonable basis for the ten-day holding period. Plaintiffs' comparison to automobile dealers does not undermine the reasonable basis of the Act. It is apodictic that the legislature cannot affect all possible trails of stolen goods in every enactment. That the legislature seeks to erect a barricade at one gate to slow the traffic does not violate the Equal Protection Clause in that other paths have not yet been blocked. "The Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams, supra*, 397 U.S. at 486–87, 90 S.Ct. at 1162, citing *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369 (1911).

INTERSTATE COMMERCE

Plaintiffs' final attack on the holding period alleges that the Act places an impermissible burden on interstate commerce. The general rule for determining whether a State has placed an impermissible burden on interstate commerce is stated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970):

"... Where the statute regulates evenhandedly to effectuate a legitimate local public interest, and its effects on interstate commerce are only incidental, it will be upheld unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits.... If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities...." (Citations omitted.) *Id.* at 142, 90 S.Ct. at 847.

In *Hughes v. Oklahoma*, 441 U.S. 322, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979), the United States Supreme Court set out a three-part inquiry under the general rule:

"... we must inquire (1) whether the challenged statute regulates evenhandedly with only 'incidental' effects on interstate commerce, or discriminates against interstate commerce either on its face or in practical effect; (2) whether the statute serves a legitimate local purpose; and, if so, (3) whether alternative means could promote this local purpose as well without discriminating against interstate commerce...." *Id.* at 336, 99 S.Ct. at 1736.

Further, the Court stated:

"... The burden to show discrimination rests on the party challenging the validity of the statute, but '[w]hen discrimination against commerce ... is demonstrated, the burden falls on the State to justify it both in terms of the local benefits flowing from the statute and the unavailability of non-discriminatory alternatives adequate to preserve the local interests at stake...." *Id.* at 336, 99 S.Ct. at 1736.

Here, our inquiry need not be lengthy because plaintiffs have failed to meet their burden to show discrimination on interstate commerce. The ten-day holding period is certainly even-handed; it makes no distinction between interstate and intrastate commerce. Further, even assuming some discrimination existed, it is so slight and incidental that it is greatly outweighed by the local benefits in reduced crime.

Therefore, in accordance with the above discussion, we find that the ten-day holding period of § 5(d) of the Act does not violate the constitutional rights of plaintiffs.

SEARCH AND SEIZURE

Plaintiffs contend that § 8 of the Act violates their right to be secure in their papers and effects as provided under the Fourth Amendment to the Constitution of the United States. Section 8 provides:

"Sec. 8. K.S.A. 16–718 is hereby amended to read as follows: 16–718. Every pawnbroker *or precious metal dealer*, and every person employed by a pawnbroker *or precious metal dealer* in the conduct of *the pawnbroker's or dealer's* business, shall admit to any and every part of the premises designated in the license, at any time, any law enforcement officer of the city or county issuing *the pawnbroker's or dealer's* license to examine any goods, articles, things, pledges, pawns, books or other records on the premises; and to search for and to take into possession any article known or believed by such officer to have been stolen. Such law enforcement officer may make any such search or seizure as is provided for in this section, and property so seized shall be receipted for by such officer who shall adequately describe the seized property and sign *the* receipt."

The United States Supreme Court, in the past twenty years, has considered on several occasions the validity of warrantless searches on business premises. The foundation of the law in this area began with *Camara v. Municipal Court*, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967), in which

an individual refused a city building inspector access to the individual's apartment absent a search warrant. The individual was charged with refusing to permit a lawful inspection in violation of the code. The Supreme Court held that the Fourth Amendment barred prosecution of a person who refused to permit a warrantless code-enforcement inspection of his personal residence; and, further, that warrantless administrative searches cannot be justified on the grounds that they make minimal demands on occupants. The Court stated:

"... In assessing whether the public interest demands creation of a general exception to the Fourth Amendment's warrant requirement, the question is not whether the public interest justifies the type of search in question, but whether the authority to search should be evidenced by a warrant, which in turn depends in part upon whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search. See *Schmerber v. California*, 384 U.S. 757, 770–771 [86 S.Ct. 1826, 1835–1836, 16 L.Ed.2d 908]. It has nowhere been urged that fire, health, and housing code inspection programs could not achieve their goals within the confines of a reasonable search warrant requirement. Thus, we do not find the public need argument dispositive.

\* \* \* \* \* \*

"In summary, we hold that administrative searches of the kind at issue here are significant intrusions upon the interests protected by the Fourth Amendment, that such searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual ..."

387 U.S. at 533–34, 87 S.Ct. at 1733.

The Supreme Court promptly decided *See v. City of Seattle*, 387 U.S. 541, 87 S.Ct. 47, 17 L.Ed.2d 51 (1967), and applied the *Camara* principles to an inspection of private commercial premises. The Court stated:

"In *Go-Bart Importing Co. v. United States*, 282 U.S. 344 [51 S.Ct. 153, 75 L.Ed. 374]; *Amos v. United States*, 255 U.S. 313 [41 S.Ct. 266, 65 L.Ed. 654]; and *Silverthorne Lumber Co. v. United States*, 251 U.S. 385 [40 S.Ct. 182, 64 L.Ed. 319], this Court refused to uphold otherwise unreasonable criminal investigative searches merely because commercial rather than residential premises were the object of the police intrusions. Likewise, we see no justification for so relaxing Fourth Amendment safeguards where the official inspection is intended to aid enforcement of laws prescribing minimum physical standards for commercial premises. As we explained in *Camara*, a search of private houses is presumptively unreasonable if conducted without a warrant. The businessman, like the occupant of a residence, has a constitutional right to go about his business free from unreasonable official entries upon his private commercial property. The businessman, too, has that right placed in jeopardy if the decision to enter and inspect for violation of regulatory laws can be made and enforced by the inspector in the field without official authority evidenced by a warrant."

387 U.S. at 543, 87 S.Ct. at 1739.

However, from the general rules of *Camara* and *See*, the Supreme Court carved exceptions in the cases of *Colonnade Catering Corp. v. United States*, 397 U.S. 72, 90 S.Ct. 774, 25 L.Ed.2d 60 (1970); and *United States v. Biswell*, 406 U.S. 311, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972). In *Donovan v. Dewey*, —— U.S. ——, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), the Supreme Court succinctly stated the rule of those cases:

"These decisions make clear that a warrant may not be constitutionally required when Congress has reasonably determined that warrantless searches are necessary to further a regulatory scheme and the federal regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes."

*Id.* at 2539.

*Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), re-em-

phasized the exception to the warrant requirement. *Marshall* held that absent consent a warrant was constitutionally required in order to conduct administrative inspections under § 8(a) of the Occupational Safety & Health Act of 1970 (OSHA), 29 U.S.C. § 657(a). The Court found that the "authority to make warrantless searches devolves almost unbridled discretion upon executive and administrative officers, particularly those in the field, as to when to search and whom to search." 436 U.S. at 323, 98 S.Ct. at 1825. Accordingly, the Court concluded that:

" . . . a warrant was constitutionally required to assure a nonconsenting owner, who may have little real expectation that his business will be subject to inspection, that the contemplated search was 'authorized by statute, and . . . pursuant to an administrative plan containing specific neutral criteria.' "

*Donovan v. Dewey, supra*, 101 S.Ct. at 2539 (citing *Marshall v. Barlow's, Inc., supra*, 436 U.S. at 323, 98 S.Ct. at 1825).

It is within this framework of cases which we must consider the provisions of § 8. At the outset, we note that plaintiffs are commercial businessmen and establishments entitled to the traditional safeguards which the Fourth Amendment guarantees to the individual. *See v. City of Seattle, supra*. A warrant is required unless the plaintiffs are a class of businesses covered by the *Biswell-Colonnade* exception.

The provisions of § 8 permit law enforcement officers to search and seize items of contraband, i. e., stolen goods, from the hands of a precious metal dealer. No part of § 8 provides for a search to determine if the dealer is in compliance. The only limitation on this broad-sweeping section is that the search be made for goods which the law enforcement officers know or believe to be stolen. Therefore, the search is in the nature of a criminal search, rather than an administrative or regulatory search. As such, it cannot be said that the search is necessary to further a regulatory scheme. As a result, the provision fails to meet the *Biswell-Colonnade* exception.

Further, the provision fails under the second test of the *Biswell-Colonnade* exception in that regulatory presence is not sufficiently defined that the owner is aware that his property will be subject to periodic inspections undertaken for specific purposes. The owner has no knowledge of the law enforcement officer's investigations or hunches that might lead him to believe an item is stolen. Under the provisions of § 8, the searches could be as frequent as every day, or as sparse as once a year.

Having decided that § 8 does not meet the standards set out in the *Biswell-Colonnade* cases, we must determine whether § 8 falls within any of the traditional exceptions to the requirements of the Fourth Amendment. Warrantless searches have generally been upheld when incident to a lawful arrest [*Coolidge v. New Hampshire*, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969)]; when the articles subject to seizure are in a highly mobile vehicle [*Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979), recognizing exception]; when an inventory is made of an impounded vehicle [*South Dakota v. Opperman*, 428 U.S. 364, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976); *United States v. Martin*, 566 F.2d 1143 (10th Cir. 1977)]; when consent is given [*United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980); *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)]; when the search is incident to pursuit of a suspected criminal [*Warden v. Hayden*, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967)]; when the article is in plain view of an officer having a valid reason for being where he is [*Coolidge v. New Hampshire, supra*]; and when a protective stop and frisk is made [*Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)]. It is clear that § 8 is not contemplated to fall within any of the standard exceptions.

An analogy could be made to the "hot pursuit" exception. Precious metals are highly mobile and can easily be altered. However, this argument fails when the ten-

day holding period is implemented. Officers have ten days in which they may determine if they have evidence to support a search warrant. Further, § 5(d) provides for an additional 15-day holding period if the police chief or sheriff has probable cause to believe that any precious metal reported by a dealer has been stolen. Therefore, the precious metals may be removed from any transitory nature for a period of twenty-five days—ample time to obtain a search warrant. We find that § 8 does not fall within any of the recognized exceptions for a warrantless search.

We must then consider whether the search contemplated in § 8 violates the Fourth Amendment on its face. Here, the contemplated search and seizure are not limited to business hours or reasonable times, but may occur at "any time." Moreover, even though plaintiffs are drawn within the ambit of the Act by virtue of engaging in business as precious metal dealers, the scope of the search and seizure is virtually unlimited, or, at the very least, includes articles other than "precious metals." We note, in *Biswell, supra*, the statute granting the right to conduct warrantless searches was specifically limited in scope to conducting a search for firearms. Here, the entire business premise, and any articles therein, are subject to search and seizure.

In addition, virtually unlimited discretion is vested in the law enforcement officer as to what articles can be searched for or seized. The only limitation contained in the statute, is the law enforcement officer's "belief" that an article is stolen. Probable cause or reasonable belief is not required. A mere "belief" that a person has possession of stolen property or contraband is not sufficient to support a search and seizure of such property. *See Ybarra v. Illinois*, 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979).

Defendants have offered a construction which they believe would allow the statute to stand as constitutional. The construction, though creative, crosses the bounds of sound judicial interpretation. The limitations defendants suggest cannot be read facially or impliedly upon this statute. Therefore, we hold that § 8 of the Act violates plaintiffs' rights under the Fourth and Fourteenth Amendments.

SEVERABILITY

The question remains whether § 8 may be severed from the statute. The general doctrine is that only the invalid parts of a statute are without legal efficacy. This is qualified by the further rule that "if the void and valid parts of the statute are so connected with each other in the general scheme of the act that they cannot be separated without violence to the evident intent of the legislature, the whole must fall." *State, ex rel. v. Owens*, 197 Kan. 212, 230, 416 P.2d 259, 274 (1966). Absent a savings clause, the test of severability is "whether the legislature would have eliminated the offending portion of the act, if advised of the infirmity, and would have enacted the measure absent the offending portion." *Wall v. Harrison*, 201 Kan. 600, 605, 443 P.2d 266, 271 (1968). We find that § 8 may be excised from the Act without doing violence to the legislative intent, which was to regulate and license precious metals dealers. The absence of a provision authorizing an unconstitutional search in no way hinders the provisions establishing a method to license and to regulate the precious metals dealers.

IT IS BY THE COURT THEREFORE ORDERED that defendants' motions to dismiss are hereby denied. IT IS FURTHER ORDERED that plaintiffs' request for relief is granted in part and denied in part. IT IS FURTHER ORDERED that defendants are hereby permanently enjoined from enforcing the provisions of § 8 of Substitute for House Bill No. 2119, which became effective July 1, 1981.