*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0054p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

TENNESSEE SCRAP RECYCLERS ASSOCIATION,
METAL MANAGEMENT MEMPHIS, LLC, and
H. ISKIWITZ & CO., INC.,
  *Plaintiffs-Appellants,*

  *v.*

PHIL BREDESEN, Governor of the State of
Tennessee, THE CITY OF MEMPHIS, WILLIE
HERENTON, Mayor of the City of Memphis,
LARRY A. GODWIN, Chief of Police for the
City of Memphis, and WILLIAM L. GIBBONS,
in his official capacity as District Attorney for
the Thirtieth Judicial District,
  *Defendants-Appellees.*

No. 08-5824

_____

Appeal from the United States District Court
for the Western District of Tennessee at Memphis.
No. 08-02073—Bernice B. Donald, District Judge.

Argued: December 11, 2008

Decided and Filed: February 13, 2009

Before: MARTIN and GILMAN, Circuit Judges; CARR, Chief District Judge.[*]

_____

## COUNSEL

**ARGUED:** James F. Blumstein, VANDERBILT LAW SCHOOL, Nashville, Tennessee, for Appellants. Philip E. Oliphant, CITY OF MEMPHIS, Memphis, Tennessee, Steven Ashley Hart, OFFICE OF THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees. Paul H. Morris, MARTIN, TATE, MORROW & MARSTON, Memphis, Tennessee, for Amici Curiae. **ON BRIEF:** James F. Blumstein, VANDERBILT LAW SCHOOL, Nashville, Tennessee, John Ward McQuiston II, EVANS & PETREE, Memphis, Tennessee, for Appellants. Philip E. Oliphant, CITY OF MEMPHIS, Memphis, Tennessee, Steven Ashley Hart, OFFICE OF

_____

[*] The Honorable James G. Carr, Chief United States District Judge for the Northern District of Ohio, sitting by designation.

1

THE TENNESSEE ATTORNEY GENERAL, Nashville, Tennessee, for Appellees. Paul H. Morris, Adam Calhoun Simpson, MARTIN, TATE, MORROW & MARSTON, Memphis, Tennessee, Danielle F. Waterfield, INSTITUTE OF SCRAP RECYCLING INDUSTRIES, Washington, D.C., for Amici Curiae.

––––––––––––––

**OPINION**

––––––––––––––

BOYCE F. MARTIN, JR., Circuit Judge.   The Tennessee Scrap Recyclers Association and its co-plaintiffs, two scrap metal dealers in Memphis, Tennessee (collectively "the scrap dealers"), appeal the district court's denial of their motion for a preliminary injunction to enjoin enforcement of a Memphis ordinance requiring scrap metal dealers to "tag and hold" the scrap metal they acquire for a period of ten days.  The scrap dealers also appeal the district court's denial of their motion for partial summary judgment on the constitutionality of the law.

The scrap dealers argue that the "tag and hold" ordinance is unconstitutional in four ways: first, they argue that it violates the dormant commerce clause, either as a direct regulation of interstate commerce or an undue burden upon it; second, they argue that it takes property without just compensation; third, they argue that it takes property without procedural due process; and fourth, they argue that it violates federal law by restricting the use of legal tender and infringing upon the federal power to coin money.

Because we find that none of the scrap dealers' arguments is likely to succeed on the merits, and that they have not shown they are entitled to partial summary judgment, we AFFIRM.

I.

Scrap metal recycling is big business in Tennessee.  Tennessee scrap metal dealers annually ship 120 million pounds of scrap metal, 95% of which is eventually sold out of state.  The value of this metal exceeds $1.7 billion.  Plaintiff Metal Management

Memphis alone annually ships 38 million pounds of scrap metal; plaintiff H. Iskiwitz & Co. annually ships 8.3 million pounds.

The scrap metal industry is composed of dealers of various sizes, and it operates in a pyramid structure, with small dealers purchasing scrap metal and reselling it to larger dealers up the chain of distribution, where the scrap metal is eventually baled and shipped to be "processed" (i.e. melted down). To resell scrap metal, individual dealers first sort the different metals in their inventory into piles, then they bundle the individual piles together for resale in unprocessed form. To reduce their risk from volatile metal prices, scrap metal dealers prefer to bundle and resell purchased scrap as quickly as possible.

A regrettable corollary of the scrap metal market is metal theft. Much like pawn shops, used jewelry stores, and other purchasers in secondary markets, scrap metal dealers can serve as fences for individuals seeking to sell stolen goods. As a result, many cities and states regulate scrap metal dealers to deter metal theft and aid law enforcement in prosecuting metal theft. Both the City of Memphis and the State of Tennessee have scrap dealer laws. The Tennessee law has been on the books since 1968; however, it was substantially revised in 2008 and the provisions that were the subject of this lawsuit were removed.[1] The Memphis scrap dealer ordinance was passed in December 2007, amidst a historic wave of scrap metal theft in Memphis—reported metal thefts for the first five months of 2007 were 821.7% higher than the same period the previous year. The burden of this increase fell largely upon urban businesses, utilities, and community organizations, who lobbied local government for stricter regulation of scrap metal dealers. In response, the City of Memphis passed an ordinance providing for comprehensive regulation of scrap dealers. Its provisions include a permit requirement, screening and record-keeping requirements for all scrap metal purchases, mandatory delays on cash payment for certain frequently stolen metals, and a ten-day waiting period wherein scrap metal dealers must "tag and hold" purchased metal so that

---

[1]The district court did not decide the merits of the claims against the state and neither party argues that they are at issue in this appeal.

victims of metal theft and law enforcement can inspect it.  Memphis, Tenn., Ordinance 5217 (Dec. 13, 2007) (codified at MEMPHIS, TENN., CODE OF ORDINANCES § 6-40 (2008)).

Local scrap dealers strongly objected to the ordinance, particularly the ten-day "tag and hold" provisions, which the dealers claimed would put them out of business. The dealers argued they would have to acquire more land or reduce inventory to comply with "tag and hold," and that the holding period would impair their ability to buy and sell scrap metal, increase their business risk, and impair their access to credit.

When Memphis made it clear that it intended to enforce "tag and hold," the Tennessee Scrap Dealers Association, Metal Management Memphis, and H. Iskiwitz & Co. filed suit to enjoin enforcement.    The district court denied the scrap dealers' motion for a preliminary injunction, holding that while the scrap dealers had shown a likelihood of irreparable harm, they had not shown a sufficient likelihood of success on the merits on any of their claims.  The district court denied the scrap dealers' motion for partial summary judgment "for the same reasons." The scrap dealers now appeal.

## II.

A preliminary injunction is an extraordinary remedy designed to preserve the relative positions of the parties until a trial on the merits can be held.  Whether to grant a preliminary injunction is a matter within the discretion of the district court and is thus reviewed for abuse of discretion. *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 540 (6th Cir. 2007).  Under this standard, this Court reviews the district court's legal conclusions de novo and its factual findings for clear error. *Id.* at 541.  In determining whether to grant a preliminary injunction, district courts consider four factors: (1) whether the movant has demonstrated a likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the injunction is not issued; (3) whether the injunction will cause substantial harm to others if issued; and (4) whether granting the injunction will serve the public interest. *Id.* at

542. Whether the plaintiff is likely to succeed on the merits is a determination of law that is reviewed de novo. *Id.* at 541.

Whether to grant a motion for summary judgment is a question of law; thus, the district court's ruling on a motion for summary judgment is reviewed de novo. *Hunt v. Sycamore Community School District*, 542 F.3d 529, 534 (6th Cir. 2008). Summary judgment is proper where no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Id.*

III.

The primary question in this appeal is whether the district court erred in ruling that the scrap dealers were not likely to succeed on the merits of any of their claims. As we proceed to explain in detail, we agree with the district court's assessment of the scrap dealers' constitutional challenges.

*A.     The Dormant Commerce Clause*

Under the Articles of Confederation, the National Government lacked power to regulate commerce among the states, and "[b]ecause each State was free to adopt measures fostering its own local interests without regard to possible prejudice to nonresidents, . . . a 'conflict of commercial regulations, destructive to the harmony of the States' ensued." *Camps Newfound/Owatonna v. Town of Harrison,* 520 U.S. 564, 571 (1997) (quoting *Gibbons v. Ogden*, 22 U.S. (Wheat.) 1, 224 (1824) (Johnson, J., concurring)). Preventing state regulation that was "partial or contrary to the common interests," *Gibbons*, 22 U.S. (Wheat.) at 225 (Johnson, J., concurring), "was the immediate cause, that led to the forming of a convention" and the subsequent grant of the federal power over interstate commerce. *Id.* at 224. Thus,

> [t]he few simple words of the Commerce Clause . . . reflect[] a central concern of the Framers that was an immediate reason for calling the Constitutional Convention: the conviction that in order to succeed, the new Union would have to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation. *Hughes v.*

*Oklahoma*, 441 U.S. 322, 325 (1979) (citations omitted). Consistent with this, "[t]he Commerce Clause has accordingly been interpreted . . . not only as an authorization for congressional action, but also, even in the absence of a conflicting federal statute, as a restriction on permissible state regulation." *Id.* at 325.

The scrap dealers offer two theories of why the "tag and hold" law violates the dormant commerce clause. First, they argue that it is a "direct" local regulation of interstate commerce that is *per se* invalid under the dormant commerce clause. Second, they argue that under the balancing test of *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970), the burdens that "tag and hold" imposes on interstate commerce "clearly exceed [its] putative local benefits." Neither theory is persuasive.

### 1. The "Direct Regulation" Theory

The scrap dealers' "direct regulation" theory relies upon *Lemke v. Farmers Grain Co.*, 258 U.S. 50 (1922), and *Shafer v. Farmers Grain Co.*, 268 U.S. 189 (1925), two pre-New Deal decisions in which the Supreme Court struck down North Dakota laws that comprehensively regulated the buying and selling of wheat throughout the state. Reasoning that scrap metal, like wheat, is a commodity, the scrap dealers argue that *Lemke* and *Shafer* are not only persuasive, but that they indistinguishable and thus controlling. We disagree.

What counts as a "direct" burden on interstate commerce has long been a matter of difficulty for courts, and, presumably due to its questionable value as an analytical device, the "direct/incidental" distinction has fallen out of use in dormant commerce clause analysis. *See Ark. Elec. Coop. Corp. v. Ark. Pub. Serv. Comm'n*, 461 U.S. 375, 390 (1983) ("[I]t is difficult to square the mechanical line . . . based on a supposedly precise division between 'direct' and 'indirect' effects on interstate commerce, with the general trend in our modern Commerce Clause jurisprudence to look in every case to 'the nature of the state regulation involved, the objective of the state, and the effect of the regulation upon the national interest in the commerce.'") (citations omitted). Indeed, this Court has previously observed that the direct regulation doctrine "appears to have been repudiated." *CSX v. City of Plymouth*, 283 F.3d 812, 818 (6th Cir. 2002); *Maharg,*

*Inc. v. Van Wert Solid Waste Mgmt. Dist.*, 249 F.3d 544, 549 (6th Cir. 2001); *see also* Donald H. Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause*, 84 MICH. L. REV. 1091, 1093-94 (1986) ("The modern era is defined by the abandonment of the 'direct/indirect burdens' test.").

As the Supreme Court observed in *Pike*, the "direct/incidental" distinction was simply an early effort at balancing the law's effect on interstate commerce against its local benefits: "Occasionally the Court has candidly undertaken a balancing approach in resolving these issues, but more frequently it has spoken in terms of 'direct' and 'indirect' effects and burdens." 397 U.S. at 142 (citation omitted). Thus, when the Supreme Court has mentioned "directness" in its modern cases, it has explained that "there is no clear line separating the category of state regulation that is virtually per se invalid under the Commerce Clause, and the category subject to the *Pike v. Bruce Church* balancing approach," *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986), and it has emphasized that "[i]n either situation the critical consideration is the overall effect of the statute on both local and interstate activity." *Id.* at 579; *see also C & A Carbone v. Town of Clarkstown*, 511 U.S. 383, 389 (1994) ("The real question is whether the . . . ordinance is valid despite its undoubted effect on interstate commerce.").

In its more recent cases, the Supreme Court has clarified how competing state and national interests are to be evaluated under the dormant commerce clause. The Court employs a two-tiered analysis. The first prong targets the core concern of the dormant commerce clause, protectionism—that is, "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys. v. Dep't of Envtl. Quality*, 511 U.S. 93, 99 (1994); *see also CTS Corp. v. Dynamics Corp. of America*, 481 U.S. 69, 87 (1987) ("The principal objects of dormant Commerce Clause scrutiny are statutes that discriminate against interstate commerce.") (citing Donald H. Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause*, 84 MICH. L. REV. 1091 (1986)). Protectionist laws are generally struck down "without further inquiry," *Brown-Forman*, 476 U.S. at 579,

because absent an extraordinary showing the burden they impose on interstate commerce will always outweigh their local benefits.  However, if the Court determines that the law is not "protectionist," it goes on to analyze the law under the deferential *Pike* balancing test.  *C & A Carbone*, 511 U.S. at 390.  Thus, we first consider whether the "tag and hold" law discriminates against out-of-state interests—either facially, purposefully, or in practical effect.  *Maharg*, 249 F.3d at 552.

The scrap dealers have failed to advance any theory of how "tag and hold" discriminates against out-of-state interests, and it is difficult to see how they could.  This is local legislation that does not regulate parties outside of Memphis.  And it is plainly directed at the local problem of metal theft and resale in Memphis; there is no evidence to suggest it has any other purpose.  Further, if this law has any out-of-state effect at all, that effect is *beneficial* to out-of-state scrap dealers, as this ordinance burdens their competitors in Memphis.  Indeed, unlike the typical dormant commerce clause case, this ordinance is challenged by *in-state* parties because it disadvantages *them*.  This is not the sort of protectionist local legislation that is virtually *per se* invalid under the dormant commerce clause.  *Cf. Commonwealth Edison Co. v. Montana*, 453 U.S. 609,  622-23 (1981) ("There is no reason to suppose that this latitude afforded the States under the Due Process Clause is somehow divested by the Commerce Clause merely because the taxed activity has some connection to interstate commerce; particularly when the tax is levied on an activity conducted within the State.").

To the extent that the scrap dealers contend that *Lemke* and *Shafer* are controlling because they are factually indistinguishable, we disagree.  As the district court noted, those cases involved "comprehensive scheme[s] to regulate interstate commerce." *Tenn. Scrap Dealers Ass'n, et al. v. Bredesen, et al.*, No. 2:08-cv-2073 slip op. at 11 (W.D. Tenn. June 3, 2008) (order denying preliminary injunction) (citing *Lemke*, 258 U.S. at 56).  The regulatory scheme at issue in *Lemke* involved the licensing of grain warehouses, buyers, and graders of grain;  mandatory inspection and grading prior to sale;  fixed profit margins for producers and fixed grading fees; and record-keeping requirements.  And it applied to all the wheat in all of North Dakota, "[a] great

grain-growing State producing annually large crops, particularly wheat, for transportation beyond its borders." *Id.* at 53. The statute at issue in *Shafer* was similar, having been enacted to replace the one struck down in *Lemke*, and again it involved a regulation of all of the wheat in North Dakota. The Memphis ordinance at issue here is distinguishable in scope, purpose, and effect. It is a local law that applies locally, is directed at a local crime problem, and imposes only a minor restriction on the shipment of scrap metal. If indeed the problem in *Lemke* and *Shafer* was the effect of the law on interstate commerce, the negligible effect here simply does not compare.

For the foregoing reasons, we reject the scrap dealers' contention that Memphis's "tag and hold" law is invalid as a "direct regulation" of interstate commerce and affirm the district court's ruling that the scrap dealers are unlikely to succeed on the merits of this claim.

## 2. The "Undue Burden" Theory

Because Memphis's "tag and hold" ordinance is not protectionist and has a legitimate local purpose, we move to consider it under the second prong of the modern test, the *Pike* balancing test. Under the deferential *Pike* test, we will uphold the "tag and hold" law unless the burden it imposes upon interstate commerce is "clearly excessive in relation to the putative local benefits." *C & A Carbone*, 511 U.S. at 390.

### a. The Extent to which "Tag and Hold" Burdens Interstate Commerce

As explained above, the "tag and hold" ordinance is a local law with local effect that imposes a temporary burden on the shipment of scrap metal by Memphis scrap dealers. We do not doubt, as the scrap dealers emphasize, that the scrap metal industry is national in scale and that the Memphis scrap dealers are part of a "unitary interstate transaction" within that industry. But that is somewhat beside the point: this law does not regulate the national scrap metal industry; it regulates the small part of that industry that operates in Memphis. Nor do we doubt that "tag and hold" is burdensome to comply with and may significantly raise the costs of conducting their business. But

again, the difficulty with the scrap dealers' argument is that this law's effect on the individual firms in Memphis is relevant for commerce clause purposes only to the extent that it burdens the national scrap metal market. The dormant commerce clause protects *interstate commerce*, not individual firms or the structure of particular markets. *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978) ("We cannot . . . accept appellants' underlying notion that the Commerce Clause protects the particular structure or methods of operation in a retail market. . . . [T]he Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations."). Absent a showing of harm to the national scrap metal market, then, the scrap dealers' dormant commerce clause claim must fail.

Here, the scrap dealers have not shown that Memphis's regulation burdens the national scrap metal market: firms in Memphis make up a small fraction of that market, and there is no evidence here that "tag and hold" will stem the flow of scrap metal into Tennessee or out of it. Even if the "tag and hold" law injures the scrap metal market in Memphis, as the scrap dealers claim, dealers outside of Memphis are likely to expand their recycling businesses to fill the resulting void and negate any potential ill effect of the law on the national scrap metal market.

Recognizing these difficulties, the scrap dealers argue that we should consider the effect on interstate commerce if "tag and hold" laws were adopted across the country. But they have failed to explain why the potential effect of similar laws on the scrap metal industry is relevant to whether *this law* violates the dormant commerce clause, and it makes little sense to undertake such an inquiry here.[2]

---

[2]The Supreme Court's decisions reveal that other laws are only relevant to the dormant commerce clause inquiry to the extent they demonstrate the burdensome effect *of the law at issue*. The Court has looked to other laws in cases only where a state law has the practical effect of regulating commerce wholly outside the state, *see, e.g.*, *Healy v. Beer Inst.*, 491 U.S. 324 (1989) (liquor prices); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573 (1986) (liquor prices), or where inconsistent state safety laws tend to suppress the interstate shipping industry. *See Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429 (1978) (truck length); *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520, 525 (1959) (truck mud flaps); *S. Pac. Co. v. Arizona*, 325 U.S. 761 (1945) (train length). Clearly, those cases raise dormant commerce clause concerns. This case does not.

### b.     The Putative Local Benefits of "Tag and Hold"

The scrap dealers next argue that the "tag and hold" law has no local benefits. They first argue that stolen metal generally cannot be reattached, so the only goal served by "tag and hold" is aiding prosecution. The scrap dealers then argue that only marked metal has law enforcement benefits because metal is fungible, so unmarked metal has little forensic use. This is problematic, they contend, because it is already illegal under Tennessee law for them to buy metal marked with the owner's name without proof of ownership. *See* TENN. CODE ANN. § 62-9-106 (2008). Further, the scrap metal dealers argue that less restrictive alternatives are available, such as requiring scrap dealers to I.D. their customers and collaborating to blacklist metal thieves.

We disagree that "tag and hold" has no local benefits. As Memphis points out, unmarked metal is not wholly fungible: an individual piece of stolen unmarked metal could be identified based upon any distinctive feature, such as metal type, size, shape, color, age, or from any recognizable dents, scratches, or rough edges from how it was removed. Machine parts, such as air conditioning coils from HVAC systems, are even easier to identify, as they vary with the make and model of the machine they are taken from. Thus, contrary to the scrap dealers' assertion, unmarked scrap metal has legitimate forensic value, and if scrap dealers were allowed to sort, pile, bale, and resell scrap metal immediately upon purchase this value would quickly be lost. Further, while the alternative regulatory schemes suggested by the scrap dealers seem to have many virtues, they do not preserve evidence for the inspection of law enforcement and those aggrieved by metal theft. Thus, "tag and hold" has demonstrable independent value as a law enforcement device. And this value extends beyond the individual prosecutions that "tag and hold" enables: the mere existence of "tag and hold" deters metal theft because of the increased possibility of prosecution that metal thieves face.

### c.     Balancing of the Pike Factors

Because we find that Memphis's "tag and hold" law will not burden interstate commerce, and that it has value as a law enforcement mechanism, the burden it imposes on interstate commerce is not "clearly excessive in relation to its putative local benefits." Indeed, whatever burdensome effect "tag and hold" might have on the scrap dealers is far afield from the concerns animating the dormant commerce clause. As noted above, the only conceivable out-of-state effect of this law *benefits* out-of-state parties and thus will not have any "tendenc[y] toward [the] economic Balkanization that had plagued relations . . . among the States under the Articles of Confederation." *Hughes*, 441 U.S. at 325. Further, because in-state parties have access to their own state's political process and because states are unlikely to act against their own economic interest by injuring important domestic industries, dormant commerce clause challenges brought by in-state parties against non-protectionist laws are inherently suspect. *Cf. Exxon*, 437 U.S. at 127 ("[T]he Clause protects the interstate market, not particular interstate firms, from prohibitive or burdensome regulations.").

For the foregoing reasons, the scrap dealers are unlikely to succeed on the merits of their dormant commerce clause claim.

### B.     Taking Without Just Compensation

The scrap dealers' second claim is that the "tag and hold" law takes their property without just compensation in violation of the Fifth Amendment, either as a physical taking or a regulatory taking.

### 1.     Physical Taking

The scrap dealers contend the law physically takes their property in two ways. First, they argue that the ten-day holding period is a temporary physical taking. Second, they argue that the requirement that the tagged scrap metal be open to inspection "by anyone desiring to investigate," MEMPHIS, TENN., CODE OF ORDINANCES § 6-40-13(H)

(2008), grants a permanent easement upon their premises and forces them to disclose their trade secrets to their competitors.

A physical taking requiring just compensation "is a direct government appropriation or physical invasion of private property," *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537 (2005), that "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

### a.     The Ten-Day Holding Period

The holding period does not constitute a "direct governmental appropriation or physical invasion" of the scrap dealers' property protected by the Fifth Amendment. Neither the government nor a third party authorized by the government, *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 440 (1982), physically invades the scrap dealers' property by means of the holding period. Nor does the holding period physically appropriate the scrap dealers' property—either their scrap metal or their premises. Rather, the holding period limits the scrap dealers' *use* of their scrap metal (and derivatively, wherever they choose to keep it) for a period of ten days. Regulations of a party's use of its property are not physical takings. *See id.* ("So long as these regulations do not require the landlord to suffer the physical occupation of a portion of his building by a third party, they will be analyzed under the multifactor inquiry generally applicable to nonpossessory governmental activity.").

### b.     The Requirement that the Tagged Metal be Open for Inspection

The inspection requirement does not physically take the scrap dealers' property either. The scrap dealers analogize the inspection requirement to the Supreme Court's decisions in *Loretto* and *Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987); however, those cases are not on point—they involve complete, permanent appropriations of the owner's right to exclude others that are fundamentally unlike the limited, temporary intrusion at issue here.

For example, in *Loretto*, the Supreme Court held that a New York law that permitted cable companies to run cable lines on buildings authorized a physical taking because a permanent physical occupation such as this deprives the owner of all incidents of property ownership—that is, the ability to "possess, use, and dispose of it." 458 U.S. at 435. The Court distinguished permanent physical invasions of property from temporary, limited ones that do not rise to the level of a taking. *Id.* at 435-36. Likewise, in *Nollan*, the Court held that a taking had occurred when a city conditioned a favorable zoning decision on the grant of an easement across the owners' property. In doing so, the Court explained that

> where governmental action results in [a] permanent physical occupation of the property, by the government itself or by others, our cases uniformly have found a taking to the extent of the occupation . . . . We think a permanent physical occupation has occurred, for purposes of that rule, where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed.

483 U.S. at 831-32 (internal quotation marks omitted). Thus, a permanent and continuous right to use another's property is equivalent to a permanent physical occupation, because it wholly deprives the owner of his right to exclude others from his property. *See also Lingle*, 544 U.S. at 539 ("A permanent physical invasion . . . eviscerates the owner's right to exclude others from entering and using her property.").

Here, the inspection provision in Memphis's "tag and hold" law does not authorize a "classic right-of-way easement," *Nollan*, 483 U.S. at 832 n.1, that wholly denies the scrap dealers the right to exclude others from their property and thus physically takes their property. Rather, the ordinance authorizes a brief inspection of a specific part of the scrap dealers' inventory and premises for a specifically enumerated purpose "during normal business hours." MEMPHIS, TENN., CODE OF ORDINANCES § 6-40-13(H) (2008).

Further, while the scrap dealers contend that the statute authorizes literally "anyone" to inspect their premises, we do not believe that their interpretation stands as

the best reading of the statute. The phrase "anyone desiring to inspect" must be read in the context of the "tag and hold" provision as a whole. Manifestly, this is intended to allow law enforcement and those aggrieved by metal theft access to scrap metal "in order that identification" of stolen scrap metal "may be easy." *Id.* Individuals who have not been aggrieved by metal theft cannot identify any stolen scrap metal and thus they have no legitimate interest in inspecting the scrap dealers' inventory to begin with. For this reason, we decline to read this ordinance as authorizing literally "anyone" to enter the scrap dealers premises to inspect their inventory. In doing so, we note that this reading is in accord with purpose of the law, the Tennessee Supreme Court's interpretation of a very similar statute, *see State v. Legora*, 34 S.W.2d 1056, 1057 (Tenn. 1931) (holding that "any citizen" means "any citizen whose property has been stolen" because this interpretation was "in harmony with the declared object of the statute"), and with our duty to interpret statutes so as to avoid constitutional doubt. *NLRB v. Jones & Laughlin Steel Corp.*, 301 U.S. 1, 30 (1937) ("The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act. Even to avoid a serious doubt the rule is the same.").[3]

In sum, the physical invasion authorized by this statute is easily distinguishable from the permanent physical invasions of property that the Supreme Court has held to be physical takings. It authorizes a small class of individuals to temporarily enter the scrap dealers' premises during normal business hours for a single enumerated purpose. This is fundamentally unlike the permanent physical invasions at issue in *Nollan* and *Loretto*. *Cf. Boise Cascade Corp. v. United States*, 296 F.3d 1339, 1357 (Fed. Cir. 2002) (upholding the government's right to conduct periodic owl surveys on defendant's property over a takings claim because of the "extremely limited and transient nature of the intrusion" and its legitimate regulatory purpose).

---

[3]This interpretation of the inspection provision also distinguishes *Ruckelshaus v. Monsanto*, 467 U.S. 986 (1984), and forecloses the scrap dealers' theory that the inspection provision authorizes disclosure of their trade secrets.

For the foregoing reasons, we hold that the scrap dealers are not likely to succeed on the merits of their physical takings claims.

### 2. Regulatory Taking

The scrap dealers also argue that the "tag and hold" law is a regulatory taking—a regulation that "goes too far" in restricting a property owner's use of their property. *Penn. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922). The Supreme Court uses two tests to evaluate whether a regulatory taking has occurred. Where a governmental action deprives property owners of "all economically beneficial uses" of their property, it is a categorical regulatory taking under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992). In all other cases—that is, where the property is not rendered valueless—the Court uses the balancing test of *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). *See Tahoe-Sierra Pres. Council v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002); *Lucas*, 505 U.S. at 1019 n.8.

### a. Regulatory Taking under Lucas

The "tag and hold" ordinance does not render the scrap dealers' property "a total loss," *id.*, and is thus not a taking under *Lucas*, because the metal can be sold during the holding period and has resale value when the holding period ends. *See Peterman v. Coleman*, 764 F.2d 1416, 1419 (11th Cir. 1985) ("Although the right to transfer possession of property is an important attribute of ownership, we cannot say that by briefly suspending this right the County has 'taken' appellant's property. If indeed there is any diminution in value by virtue of a dealer's temporary inability to transfer possession, such an effect is too incidental to amount to a taking for which compensation is required under the Constitution.").[4]

_____

[4]Consistent with this, the Supreme Court has held that the *Lucas* rule is inapplicable to temporary deprivations of property. *Tahoe-Sierra*, 535 U.S. at 331-32 ("[A] permanent deprivation of the owner's use of the entire area is a taking of 'the parcel as a whole,' whereas a temporary restriction that merely causes a diminution in value is not. Logically, a fee simple estate cannot be rendered valueless by a temporary prohibition on economic use, because the property will recover value as soon as the prohibition is lifted.")

#### b.    *Regulatory Taking under* Penn Central

In *Penn Central*, the Supreme Court explained that while "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty," 438 U.S. at 124, its decisions "have identified several factors that have particular significance" in this determination, including (1) "[t]he economic impact of the regulation"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action," as a taking "may more readily be found when the interference with property can be characterized as a physical invasion by government," *id.*, or when the regulation lacks a legitimate public purpose. *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485-86 (1987). As noted above, *Penn Central* is the test tailored for the various situations that fall factually between the extremes of *Loretto* and *Lucas*, but still might constitute takings because of the law's intrusiveness and the economic impact. *Penn Central*, the Court has emphasized, is not necessarily an easier standard to satisfy that *Loretto* and *Lucas*; it is likewise focused on identifying situations that approximate traditional physical takings. *See Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 539 (2005). In the *Penn Central* context, then, as under *Loretto* and *Lucas*, the issue is "the severity of the burden that government imposes upon private property rights." *Id.* Because the Memphis ordinance does not in any way approximate a traditional physical taking, we hold that the Memphis ordinance does not take the scrap dealers' property under the *Penn Central* test.

The first prong of the *Penn Central* test is the economic impact of the regulation. As noted above, the scrap dealers have failed to show that the holding period will decrease the value of their scrap metal. To the extent they argue that "tag and hold" will harm their business as a whole, two points must be made. First, it is not clear that "tag and hold" will have the severe economic impact the scrap dealers suggest. The ten-day holding period appears likely to raise their business risks, but the impact of this is speculative given the existing time it takes to resell metal purchases and the relative

unpredictability of the scrap metal market.[5]  Second, diminution in the value of property or other financial injury because of regulatory action by itself does not generally constitute a taking.  *Concrete Pipe and Prod. of Cal., Inc. v. Const. Laborers' Pension Trust*, 508 U.S. 602, 645 (1993) ("[O]ur cases have long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking.").[6]  The economic impact of "tag and hold" thus weighs against finding a taking.

The second, closely related, prong of the *Penn Central* test is the law's degree of interference with distinct investment-backed expectations.  As an initial matter, we reiterate that it is not clear that the Memphis ordinance will cause the scrap dealers economic harm approaching a level sufficient to establish a taking.  Consistent with this, their investment-backed expectations claims are generalized and vague, involving the general health of their business rather than specific property, development plans, or figures as to their property's likely diminution of value.  As the Supreme Court has explained, unilateral expectations and abstract needs are not sufficient to raise takings concerns, *Ruckelshaus*, 467 U.S. at 1005-06, nor does being "denied the ability to exploit a property interest" previously available for development.  *Penn Central*, 438 U.S. at 130.  Further, the scrap dealers operate in an industry that, due to the longstanding problem of metal theft, has long been regulated, and has in fact been regulated in Tennessee.  Indeed, until the recent revisions the Tennessee law contained provisions substantially similar to those challenged in this lawsuit.  This regulatory context undercuts the reasonableness of the scrap dealers' reliance.  *Concrete Pipe*, 508 U.S. at

---

[5]Several federal courts have persuasively rejected similar arguments.  *See, e.g.*, *Peterman v. Coleman*, 764 F.2d 1416, 1419 (11th Cir. 1985) ("[W]e conclude that the five-day holding period . . . does not result in a 'taking' of appellant's property so as to require compensation. . . . [W]hile the holding period may have some effect on one of appellant's interests in the property, we do not think this slight attenuation is a deprivation of property in the constitutional sense."); *Gallaher v. City of Huntington*, 759 F.2d 1155, 1160 (4th Cir. 1985) ("[R]esale is not interfered with, only the physical appearance and location of the items must remain unaltered, and . . . the market goes up at least as frequently as it goes down in value, [so] the ten-day period is neutral in its overall impact for it will favor as many dealers as it will injure."); *Joe Flynn Rare Coins v. Stephan*, 526 F.Supp. 1275, 1282 (D. Kan. 1981) ("[A]ny diminution of value in the goods is speculative. In a declining market, the value could diminish. In a rising market, the dealer will benefit from the ten-day holding period.").

[6]In support of this, the Court cites *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (approximately 75% diminution in value), and *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (92.5% diminution).

645 (rejecting the claim of interference with reasonable investment-backed expectations, stating: "[T]hose who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end.") (citations omitted).   The effect of the Memphis ordinance on the scrap dealers' reasonable investment-backed expectations does not support their takings claim.

The third prong of the *Penn Central* test is the nature of the governmental action. As discussed above, the "tag and hold" law imposes regulatory burden on the scrap dealers' property rights rather than a physical one.  Further, the burden imposed is temporary, and it does not deny the scrap dealers all incidents of ownership during the ten-day holding period—it restricts the use of the scrap during that time, but it does not interfere with possession or transfer of title.  Third, it was passed for a legitimate public purpose, the prevention of metal theft.  For these reasons, the nature of the law weighs against the scrap dealers' takings claim as well.  *See Peterman*, 764 F.2d at 1419 ("Although the right to transfer possession of property is an important attribute of ownership, we cannot say that by briefly suspending this right the County has "taken" appellant's property."); *Andrus v. Allard*, 444 U.S. 51, 66 (1979) ("[A] reduction in the value of property is not necessarily equated with a taking.  . . . [A] loss of future profits–unaccompanied by any physical property restriction–provides a slender reed upon which to rest a takings claim.").[7]

As the Supreme Court recently emphasized in *Lingle*, the aim of its takings tests is "to identify regulatory actions that are functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." 544 U.S. at 539.  As detailed above, the likely impact of "tag and hold" does not approach this level, nor does it "forc[e] some people alone to bear public burdens

---

[7]The weight of authority supports this conclusion: similar holding periods have been widely upheld in state courts, *see* 45 A.L.R.2d 1391 § 14 ("In line with the view taken in the cases set out in the original annotation, the later decisions have uniformly upheld statutes and ordinances requiring junk dealers to retain for a specified time goods purchased by them."), as well as in several federal courts. *See Gallaher*, 759 F.2d at 1160 (ten-day holding period); *Peterman*, 764 F.2d at 1418-19 (five-day holding period); *Diversified Numismatics, Inc. v. City of Orlando*, 783 F.Supp. 1337, 1344-45 (M.D. Fla. 1990) (seven-day holding period);  *Joe Flynn Rare Coins*, 526 F.Supp. at 1281-82 (ten-day holding period).

which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).  Thus, we agree with the district court that the scrap dealers are unlikely to succeed on the merits of their takings claims.

### C.     Procedural Due Process

The scrap dealers also argue that the Memphis ordinance deprives them of property without due process of law by requiring them to set aside the scrap metal they acquire for ten days.  As the district court recognized, this argument is a non-starter: even if "tag and hold" did deprive the scrap dealers of property, they have received all the process they are entitled to because the deprivation was legislative in character.  *See Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441 (1915); *Peterman*, 764 F.2d at 1419.  Thus, the scrap dealers are unlikely to succeed on the merits of their procedural due process claim.

### D.     Legal Tender

The scrap dealers' final challenge is to the law's requirement that dealers pay for air conditioning coils (a common target for thieves) with a check or money order mailed to a licensed HVAC contractor after a three-day wait, and that other purchases of scrap metal must be made with a payment voucher redeemable after three days.  MEMPHIS, TENN., CODE OF ORDINANCES § 6-40-13(I) (2008).  They argue that these provisions infringe upon federal authority to coin money under Art. I, § 8, and on the status of U.S. currency as legal tender for all debts in violation of 31 U.S.C. § 5103.  We disagree.

Neither provision restricts (or indeed regulates) what counts as legal tender for the ultimate payment of debts–checks, money orders, and vouchers are *promises to pay legal tender for the discharge of debt*, they are not legal tender themselves.  Likewise, the restriction here is not on the substance of payment but on its form.  *See Genesee Scrap & Tin Baling Co. v. City of Rochester*, 558 F. Supp. 2d 432, 436 (W.D.N.Y. 2008) ("[T]he Ordinance does not, by its terms or effects, alter the legal-tender status of cash. It simply provides that junk and scrap dealers, rather than paying cash outright for junk,

must pay in the form of a check, which the seller of the junk can then convert into legal tender, i.e., cash."); *Metal Mgmt. Miss., Inc. v. Barbour,* 2008 WL 3842979 slip op. at *11 (S.D. Miss. Aug 13, 2008) ("Senate Bill No. 2006 § 4 does not attempt to declare checks and money orders legal tender. The statute simply limits the manner of payment of legal tender for scrap metal purchases."). Because the law does not make any of the various instruments themselves legal tender, it implicates neither the legal tender statute nor the constitutional power to coin money. Thus, the district court did not err in ruling that the scrap dealers were unlikely to succeed on the merits of this claim.

## IV.

Having found that the scrap dealers were unlikely to succeed on the merits of their claim, the district court proceeded to weigh the remaining factors for deciding whether to grant a preliminary injunction. It found that the scrap metal dealers were likely to suffer irreparable harm if "tag and hold" was enforced, that the City of Memphis would suffer substantial harm if an injunction was issued, and that an injunction was likely to harm the public interest. After balancing all four factors, the district court concluded that they weighed in favor of Memphis and denied the scrap dealers' motion for a preliminary injunction.

We agree with the district court that the scrap dealers are unlikely to succeed on the merits of any of their claims and see no basis to overturn its other findings. Thus, we hold that the district court did not abuse its discretion in denying the scrap dealers' motion for a preliminary injunction. Likewise, because we find that the scrap dealers have not shown they are entitled to partial summary judgment on any of their claims, we also affirm the district court's denial of their motion for partial summary judgment.

## V.

AFFIRMED.