NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0540n.06

No. 24-3530

## UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

FILED

Nov 24, 2025

KELLY L. STEPHENS, Clerk

STEVE SNYDER; TIM SNYDER; T&S AGRIVENTURES, LLC; BETH ROSE REAL ESTATE AND AUCTIONS, LLC,

   Plaintiffs-Appellants,

v.

VILLAGE OF LUCKEY, OHIO,

   Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

Before: CLAY, GIBBONS, and STRANCH, Circuit Judges.

STRANCH, J., delivered the opinion of the court in which GIBBONS, J., concurred. CLAY, J. (pp. 21–37), delivered a separate dissenting opinion.

**JANE B. STRANCH, Circuit Judge.** Tim and Steve Snyder, through their company, T&S Agriventures (collectively, the Snyders), intended to auction several parcels of land, though the Village of Luckey publicly expressed interest in acquiring the land. The auction took place, but it did not lead to a sale above the reserve value set by the Snyders. In response, the Snyders and their auctioneer, Beth Rose Real Estate and Auctions, LLC (Rose), sued the Village under 42 U.S.C. § 1983, asserting claims based on the Fifth Amendment's Takings Clause and the Fourteenth Amendment's Equal Protection and Due Process Clauses. The district court dismissed the Amended Complaint and denied Plaintiffs' subsequent motion to alter and amend the judgment. Plaintiffs appeal both orders. For the following reasons, we **AFFIRM** the dismissal order and the denial of Plaintiffs' motion to alter and amend.

## I.   BACKGROUND

### A.   Factual Allegations[1]

In March 2005, through their limited liability company, T&S Agriventures LLC, Steve and Tim Snyder purchased an inactive, flooded quarry and certain surrounding parcels of land (the Property) for $330,000.  Over the next fifteen years, the Snyders made significant improvements to the Property to prepare it for sale by, among other things, altering the Property's topography and grading; establishing electric and sanitary sewer services; clearing brush; and stocking and maintaining the lake.  In July 2021, they contracted with Rose to market and auction the Property on September 18 of that year.  The auction contract included a pre-auction reserve to prevent the Property from selling below a certain price.

The Village of Luckey, Ohio, where the Property sits, learned of the Snyders' plan to sell and began to take steps to acquire the Property through eminent domain.  Between August 17 and 20, 2021, the steps included:  the Village voting unanimously to direct its attorney, Corey Speweik, to "begin the eminent domain process" to acquire the Property; sending T&S Agriventures a notice of inspection informing it of the vote and that Village representatives would assess whether the Property was suitable for public use; and sending a notice of intent to acquire which indicated that the Village intended to use the Property either as a public water supply or a park.  According to the Amended Complaint, this notice of intent to acquire violated Ohio Revised Code § 743.01, which prohibits land taken for water-works purposes from "use[] for any other purpose" unless it is "by authority of the director of public service and with [the] consent of [the] legislative authority [of the Village]."  Steve Snyder responded to the Village's letter of inspection on behalf of T&S

---

[1] We relay the facts as alleged in the Amended Complaint and the documents referenced in and attached thereto, in the light most favorable to Plaintiffs, according to our standard of review at this stage.  *See Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008).

Agriventures, calling into question the propriety of the letter, threatening legal action, and demanding that Village representatives not enter the Property.[2]

On September 15, 2021, Speweik contacted Tim Snyder acknowledging the Village's desire to acquire the Property and that the value of any purchase offer depended on pending lab results of tests of the quarry's water. The following day, Speweik and Tim had a second conversation during which Speweik reiterated that the Village had not received the information necessary to accurately estimate the Property's fair market value. Afterwards, the Snyders attended a Village council meeting during which Village representatives again acknowledged that their desire to acquire the Property depended on the pending lab results and noted that the full eminent domain process could take "a couple years." One representative admitted that the Village's interest in acquiring the land stemmed from an ongoing dispute with a nearby water utility company, and the Village's mayor admitted that the Snyders' pending auction had spurred the Village to act. At the conclusion of the meeting, the council voted unanimously to authorize a buyer's agent to bid at the auction on behalf of the Village.

Also on September 16, the Village sent a second Notice of Intent to Acquire to T&S Agriventures. This time, the notice stated that the Village intended to use the subject property exclusively as a water supply.

On September 18, the Village placed temporary "No Parking" signs on public streets around the Property. Its representatives conspicuously arrived and attended the auction but did not bid on the Property; the Amended Complaint alleges that the Village's representatives did this with the deliberate intention of making their presence known to deter bidding. When bidding

---

[2] Prior to the auction, the Village separately demanded that Rose inform potential bidders prior to the auction of its interest in appropriating the Property, but the Amended Complaint is silent on whether Rose complied with this demand.

closed, the Property had reached an auction price of $610,000, a value below the reserve and far below Plaintiffs' expectations. Accordingly, the Snyders retained the Property, and Rose did not receive its anticipated commission. Rose polled registered bidders after the auction failed and learned that many were dissuaded from bidding based on the Village's actions.

Two weeks after the auction, Tim Snyder met with the Village's mayor. Again, the mayor admitted that the auction motivated the Village to initiate the eminent domain process when it did and that there had been no immediate need for a new public water supply.

On October 20, 2021, the Village voted to authorize the expenditure of funds for an appraisal of the Property, and roughly one year after the auction, the Village passed a resolution authorizing the appropriation of the Property. On September 22, 2022, the Snyders received a copy of the resolution in the mail and an offer from the Village to purchase the Property for $525,000.

### B. Procedural History

In December 2022, Plaintiffs filed a verified complaint seeking damages under 42 U.S.C. § 1983 for violations of the Fifth Amendment's Takings Clause and Fourteenth Amendment's Equal Protection and Due Process Clauses, as well as both preliminary and permanent injunctive relief. After the Village moved to dismiss the suit, the Snyders and Rose filed the now-operative Amended Complaint alleging the same claims.[3] The Village again moved for dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and after briefing, the district court dismissed Plaintiffs' § 1983 claim with prejudice and, with consent of the parties, dismissed the

---

[3] Between the filing of Plaintiffs' original complaint and the Amended Complaint, the Village filed a Petition to Appropriate Real Property and Fix Compensation in the Wood Country Court of Common Pleas against the Snyders. *See Village of Luckey v. T&S Agriventures, LLC*, No. 2023 CV 0144 (Wood Cnty. Ct. Common Pleas).

requests for injunctive relief without prejudice. The district court concluded that Rose's alleged injury—her contractual interest in proceeds from the Property's sale at auction—was too speculative and uncertain to confer standing for any of the alleged claims. As for the Snyders' § 1983 claims, the district court held that the Amended Complaint failed to state a Takings Clause violation because it did not allege an infringement on any property interest protected by the clause. It further held that the Amended Complaint failed to allege any differential treatment indicating a plausible equal protection violation, or a property interest upon which the Snyders might base a substantive due process claim.

Plaintiffs filed a timely motion to alter or amend the judgment pursuant to Federal Rules of Civil Procedure 59(e) and 60(b), arguing that testimony from the state court hearing by Village officials required that the district court's decision be set aside. The district court denied the motion because Plaintiffs had the opportunity to bring forward that evidence by seeking leave to file a second amended complaint or a sur-reply in the months between the hearing and the district court's ruling, and because the relief requested was not otherwise warranted

## II.    ANALYSIS

Plaintiffs appeal both the district court's dismissal order and its denial of Plaintiffs' motion to alter or amend the judgment pursuant to Federal Rules of Civil Procedure 59(e) and 60(b). We begin our review with the dismissal order.

### A.    The District Court's Dismissal Order

We review de novo dismissals under Rule 12(b)(1) and Rule 12(b)(6). *Mohlman v. Fin. Indus. Regul. Auth.*, 977 F.3d 556, 558 (6th Cir. 2020). In doing so, we may affirm the district court's decision on any ground that is supported by the record. *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 477 (6th Cir. 2010).

A motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1) "may either attack the claim of jurisdiction on its face or it can attack the factual basis of jurisdiction." *Golden v. Gorno Bros., Inc.*, 410 F.3d 879, 881 (6th Cir. 2005). Courts hearing facial attacks to subject-matter jurisdiction must take the complaint allegations as true and construe them in the light most favorable to the non-moving party. *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994). "A *factual attack*, on the other hand, is . . . a challenge to the factual existence of subject matter jurisdiction," in which case "no presumptive truthfulness applies to the factual allegations, and the court is free to weigh the evidence" to ensure there is subject-matter jurisdiction. *Id.* at 598 (emphasis in original) (citation omitted). The plaintiff bears the burden of showing subject-matter jurisdiction exists. *Golden*, 410 F.3d at 881.

To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the plaintiff must allege facts that, if accepted as true, are sufficient to state a claim of relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court must "construe the complaint in the light most favorable to the plaintiff[] [and] accept all well-pleaded factual allegations as true. . . ." *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017). Once it has done so, "the court must take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." *Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018).

Section 1 of the Civil Rights Act of 1871, codified as 42 U.S.C. § 1983, "authorizes suits to enforce individual rights under federal statutes as well as the Constitution" against state and local government officials. *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119

(2005). Standing alone, § 1983 does not establish substantive rights. *Chapman v. Houston Welfare Rts. Org.*, 441 U.S. 600, 617 (1979). Rather, it serves as a vehicle to "vindicat[e] federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). Accordingly, an underlying constitutional or statutory violation is a predicate to liability under § 1983.

The Amended Complaint alleges that the Village violated Plaintiffs' rights under the Fifth Amendment's Taking Clause and the Fourteenth Amendment's Equal Protection and Due Process Clauses. On appeal, Rose challenges only the district court's determination that the Amended Complaint was facially insufficient to allege standing for its takings claim. The Snyders argue that they adequately pleaded all three constitutional claims. Because standing is a threshold issue, *Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 709 (6th Cir. 2015), we begin by assessing whether Rose has alleged standing to bring a takings claim.

### 1.     Rose's Standing

To establish standing, Rose must "clearly allege facts demonstrating" an injury-in-fact that is fairly traceable to the challenged conduct of the defendant and is likely to be redressed by a favorable decision. *Ward v. Nat'l Patient Acct. Servs. Sols., Inc.*, 9 F.4th. 357, 360 (6th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). Rose "bears the burden of establishing these elements . . . with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). So, when considering whether Rose pleaded a justiciable case, our analysis is confined to the four corners of the complaint, *Parsons*, 801 F.3d at 706, and Rose need only plausibly assert standing. *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021). Because "standing is not dispensed in

gross," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), Rose "must establish standing for each claim [it] presses . . ." *Oklahoma v. United States*, 62 F.4th 221, 233 (6th Cir. 2023).

At issue here is only whether Rose adequately pleaded standing to bring a takings claim. Such an injury must be "concrete and particularized." *Lujan*, 504 U.S. at 560 (internal quotation marks omitted), meaning that it is "real and not abstract," and "affect[s] the plaintiff in a personal and individual way." *Spokeo*, 578 U.S. at 340 (internal quotation marks and citations omitted).

Rose's theory of injury proposes that its contractual rights created a contingent possessory interest in the Property that the Village extinguished through its interference with the auction. But the Amended Complaint lacks any allegation that Rose's contract granted it any interest in the Property, and Rose does not argue that Ohio law grants auctioneers such an interest as a matter of course.

Rather, Rose suggests that a single case, *Wilson v. Trustee Union Township*, No. CA98-06-036, 1998 WL 744089 (Ohio Ct. App. Oct. 26, 1998), is dispositive. In *Wilson*, the court reasoned that the plaintiff, though not the property's owner at the time, had standing to challenge a zoning ordinance under the Takings Clause because he had entered into a contract to purchase the property conditioned on the property being rezoned. *Id.* at *5. It held that this contingent possessory interest was sufficient for that alleged injury to be particularized to the plaintiff, but not, as Rose argues, that any contingent interest related to property confers standing. *Id.* at *5–6. Whereas the plaintiff in *Wilson* sought to purchase the property, *see id.* at 5, the Amended Complaint does not allege Rose sought or contracted to purchase the property—instead, it sought a commission from the potential sale of the property at auction. *Wilson* is therefore inapposite. Because Rose fails to allege a possessory interest in the Property analogous to the interest in *Wilson*, Rose's theory predicated on *Wilson* fails.

Even assuming Rose alleged a cognizable injury in the form of the lost commission, the Amended Complaint does not indicate that the Village's conduct actually interfered with that right. Nor does the allegation that the Village's conduct prevented a successful auction alter this conclusion because the Property was not guaranteed to sell at auction based on the reserve that prevented it from selling below a certain price. These facts also suggest problems with the other elements of standing, traceability and redressability, which "are often 'flip sides of the same coin.'" *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 380–81 (2024) (quoting *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). Had the district court enjoined the Village from proceeding with the taking or interfering with the auction, there is no guarantee that the property would sell above the reserve value, and Rose might still receive no commission at all. This alone is sufficient to show a lack of traceability and redressability and, as a result, that Rose lacks standing. *See id.*

Elsewhere, Rose observes that courts have "recognized and enforced lien rights of auctioneers and brokers." Appellants' Br. 41. But the Amended Complaint does not suggest, let alone adequately plead that Rose was entitled to or maintained a lien on the Property or any other analogous possessory interest.

Rose therefore falls short of meeting its burden to establish standing.

2. The Snyders' Takings Claims

"The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth, provides that private property shall not 'be taken for public use without just compensation.'" *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536 (2005) (citation omitted). In this way, the Takings Clause "does not prohibit the taking of private property, but instead places a condition on the exercise of that power." *Id.* (quoting *First Eng. Evangelical Lutheran Church*

*of Glendale v. City of Los Angeles*, 482 U.S. 304, 314 (1987)). "[I]t 'is designed not to limit the governmental interference with property rights *per se*, but rather to secure *compensation* in the event of otherwise proper interference amounting to a taking." *Id.* at 537 (quoting *First Eng.*, 482 U.S. at 315).

The paradigmatic takings case involves direct government appropriation of private property. *See id.* at 537 (collecting cases). However, courts also recognize that "government regulation of private property may, in some instances, be so onerous that its effect is tantamount to a direct appropriation or ouster—and that such 'regulatory takings' may be compensable under the Fifth Amendment." *Id.*

Within regulatory takings, courts have set out two categories deemed to be per se takings for Fifth Amendment purposes. First, where the government requires an owner to suffer a permanent physical invasion of her property, however minor, she must be provided just compensation. *See, e.g.*, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 434–35 (1982) (holding that a state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking). Second, a per se taking may occur where a land-use regulation "deprives the land of all economically beneficial use," leaving it economically idle. *Andrews v. City of Mentor*, 11 F.4th 462, 468 (6th Cir. 2021) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 119 (1992)).

Outside these two narrow categories, regulatory takings are governed by the standards set forth in *Penn Central Transportation Company v. City of New York*, 438 U.S. 104 (1978). There, the Supreme Court explained that, while "[t]he question of what constitutes a 'taking' for purposes of the Fifth Amendment has proved to be a problem of considerable difficulty," its decisions "have identified several factors that have particular significance" in this determination, including: (1) the

regulation's economic impact; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action. *Id.* at 123–24.

"However, a taking does not occur merely because governmental action burdens or restricts some particular right or interest in a parcel of land." *Amen v. City of Dearborn*, 718 F.2d 789, 795 (6th Cir. 1983). The Supreme Court has made clear that, where the fair market value of a property declines as a result of a city's announcement of its intention to condemn that property, no taking occurs. *Agins v. City of Tiburon*, 447 U.S. 255, 263 n.9 (1980). "Even if [an owner's] ability to sell their property was limited during the pendency of the condemnation proceeding . . . [m]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership'" and do not amount to a taking. *Id.* (quoting *Danforth v. United States*, 308 U.S. 271, 285 (1939)).

The district court ruled that the Amended Complaint failed to plausibly allege any taking occurred. First, the district court reasoned that the Snyders had not stated a paradigmatic taking because the Amended Complaint had alleged that the Property remained with the Snyders and the Village had not refused to pay for its acquisition. It then rejected the Snyders' argument that the Village's actions constituted a per se regulatory taking depriving them of all economically beneficial uses because the Amended Complaint specifically alleged that the Property received a bid as high as $610,000 at auction. The district court concluded that Plaintiffs' alleged injury was merely the "decrease in value of the property and hampering of their ability to sell the property prior to the institution of appropriation proceedings," not an infringement of a valid property interest requiring just compensation. R. 13, Mem. Op. & Order, PageID 287; *see id.* ("Otherwise stated, the property interest identified appears to be in selling the property for an amount Plaintiffs

believe it was worth. But Plaintiffs have not cited anything to support that the so-characterized 'interest' is a protected property interest.").

On appeal, the Snyders' argument straddles two kinds of takings. For the most part, the Snyders attempt to fit the Village's actions into the second category of per se regulatory takings by arguing that those actions deprived the Snyders of their ability to make any economically beneficial use of the property. As the Snyders put it, the Village "destroy[ed] the fair market value of the [Property]" by expressing interest in acquiring it as a public water source, "completely thwart[ing]" their ability to sell the land for an appropriate price. Appellants' Br. 28–30. Elsewhere, they suggest without elaboration that the Village's conduct satisfies the standard set out in *Penn Central*. *See id.* at 30 ("In this case, 'the regulation's economic impact on the claimant, the regulation's interference with the claimant's reasonable investment-backed expectations, and the character of the government action' all mandate . . . reversal." (citation omitted)). We turn to the law and Plaintiffs' own allegations in reviewing both theories.

The first theory misconstrues what it means to deprive land of all economically beneficial use. Such per se takings only occur in the "extraordinary circumstance" where a property is rendered valueless by a regulation. *Lucas*, 505 U.S. at 1028–32. The Snyders assert that they adequately pleaded such a taking, stating that it is "undisputed that the sole and entire economic purpose of the subject property was for it to be sold at auction on" September 18, 2021. Appellants' Br. 27. But this allegation appears nowhere in the Amended Complaint. The closest allegation notes only that the improvements the Snyders made to the Property were made "with the specific intention of improving the marketability of the subject property so that it could be sold for high-end residential, or other, development." R. 8, Am. Compl., PageID 108. The notion that the Property's entire economic purpose was defeated when it failed to sell at auction is further

belied by the Snyders' allegations that the Property received a $610,000 bid—a value nearly twice the price the Snyders paid for the Property. Indeed, the only reason no sale occurred at that price was due to the Plaintiffs' setting a reserve to prevent the sale of the land at a sum the Snyders would not accept. But the Takings Clause is not a guarantee to real estate developers that they will receive a certain return on their investment. *Oberer Land Devs. Ltd. v. Sugarcreek Township*, No. 21-3834, 2022 WL 1773722, at *5 (6th Cir. June 1, 2022). The sum of $610,000 is by no means valueless, and the Snyders cannot point to any allegation suggesting the Village limited the Property's use for any other purpose.

The second theory fares no better. Though the Snyders refer to *Penn Central*'s elements in passing, they offer no substantive argument on the relevant factors. The Snyders contend that the specter of potential eminent domain proceedings constituted a taking because it depressed the value of the Property below the reserve price they set for the auction. This theory, however, runs headlong into the Supreme Court's repeated decree that "depreciation in value of the property by reason of preliminary activity is not chargeable to the government." *First Eng.*, 482 U.S. at 320 (citing *Agins*, 447 U.S. at 263 n.9); *see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 332 (2002). Absent extraordinary delay, which the Snyders have not alleged, the Village's expressed interest in the Property and any accompanying decrease in the Property's value are incidents of ownership, not grounds for a takings claim.

In their reply brief, the Snyders liken the facts of this case to those of *Amen v. City of Dearborn*, 718 F.2d 789 (6th Cir. 1983). There, we affirmed the district court's ruling that a taking had occurred based on findings that the City of Dearborn "engaged in several activities designed to force residents in the southeast section of Dearborn to sell their property to the City" over the course of ten years. *Id.* at 795–96. Those activities included, but were not limited to

(1) encouraging residents to move out by denying permits, verbally discouraging repairs, or causing unreasonable delay in the issuance of permits; (2) telling residents that the prices paid by the City for their properties would decrease or "there was a fixed maximum price for homes in the area"; (3) demanding maintenance and the installation of equipment not required by building code; and (4) allowing property the City had acquired to remain vacant and inviting the public to "strip" the homes. *Id.* at 795. The court reasoned that, notwithstanding the City's intention to acquire the affected areas of Dearborn, it "chose not to invoke its condemnation powers, but, rather, elected to engage in a deliberate course of conduct to force the sale of private property at reduced value." *Id.* at 797. Based on this, the court held "that the City's deliberate course of conduct caused such substantial damage to plaintiffs' properties that the properties in effect were actually taken within the meaning of the fifth and fourteenth amendments. . . ." *Id.* at 798.

The dissent suggests the Snyders have stated a claim analogous to that in *Amen* because they allege the Village engaged in a "deliberate course of conduct," *id.*, that amounted to an unconstitutional taking. We agree with the dissent that many aspects of the Village's conduct in this matter are troubling. Government officials should hold themselves to high standards of professional and ethical conduct. Though we do not countenance the Village's conduct, we find *Amen* distinguishable. *Id.* The dissent suggests the Village engaged in "an intentional and concerted series of actions to undermine the sale of the property, devalue the property, and acquire ownership of the property at a cheaper price." (Dissenting Op. at 35.) But where Dearborn's ten-year, "deliberate course of conduct caused substantial damage to plaintiffs' properties" in the form of the physical degradation of the plaintiffs' homes and neighborhood, *Amen*, 718 F.2d at 798, the Snyders do not allege any "substantial damage" to the Property that would affect its fair market value. *See United States v. Reynolds*, 397 U.S. 14, 16 (1970) ("In enforcing the constitutional

-14-

mandate [of the Takings Clause], the Court at an early date adopted the concept of market value: the owner is entitled to the fair market value of the property at the time of the taking."). Our takings jurisprudence does not indicate that alleged conduct interfering with a sale at auction is comparable to the years-long campaign of conduct that demonstrably and intentionally lowered property values in *Amen*. *See* 718 F.2d at 795. The Snyders' allegations suggest they have a right to test the value of the Property at a private auction in advance of any government action. "But the Fifth Amendment allows the owner only the fair market value of his property; it does not guarantee him a return of his investment." *United States ex rel. and for Use of Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 285 (1943); *see Oberer Land Devs.*, 2022 WL 1773722, at *5. If the Snyders wish to litigate the Property's fair market value, they may do so in the ordinary condemnation process.

Part of the problem in *Amen*, furthermore, was that "the City chose not to invoke its condemnation powers, but, rather, elected to engage in a deliberate course of conduct to force the sale of private property at reduced value." 718 F.2d at 797. Here, the Village *did* announce its intent to acquire the property—it did not seek to evade condemnation procedures by forcing a sale. *See id.* Indeed, the only damage the Snyders assert is the "explicit and implied limitation that [the Village] would subsequently take the [P]roperty from whomever bought it." Appellants' Br. 29. Not every "governmental interference with property rights" makes a constitutional claim, *Lingle*, 544 U.S. at 536–37 (citation modified); on the facts of this case, an "explicit and implied limitation" on the potential of the auction is an unavoidable result of the Village's announced invocation of its condemnation powers.

At bottom, the Snyders fail to allege a taking.

### 3. The Snyders' Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment commands that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. To prevail under the Equal Protection Clause, a plaintiff must demonstrate that the government treated the plaintiff disparately as compared to similarly situated persons and that such disparate treatment either: (1) burdens a fundamental right, (2) targets a suspect class, or (3) has no rational basis. *Ctr. for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 379 (6th Cir. 2011). The Snyders' equal protection claim proceeds on the third theory, which is commonly referred to as a class-of-one claim.

To adequately plead a class-of-one claim, the Snyders must allege that they have "been intentionally treated differently from others similarly situated," *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam), and that either "the government actors had no rational basis for the difference" or the "challenged government action was motivated by animus or ill-will," *Paterek v. Vill. of Armada*, 801 F.3d 630, 650 (6th Cir. 2015) (quoting *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 864 (6th Cir. 2012)).

The district court found that the Amended Complaint contained no factual allegations about the Village's treatment of other property owners. On that basis alone, it dismissed the Snyders' equal protection claim for failure to allege that they were treated differently than any similarly situated property owner.

On appeal, the Snyders' argue their allegations that "the [Village] actively and intentionally interfered with [their] ability to sell the [P]roperty and monetize their respective interests therein" constitute well-pleaded allegations that they received the disparate treatment. Appellants' Br. 36. In other words, the Snyders contend that the Amended Complaint's assertion that the Village

mistreated the Snyders constitutes a claim that the Village treated them worse than it treated others in similar circumstances. But the assertion that the Village interfered with the Snyders' interests, appropriately or not, does not speak to the Village's treatment of similarly situated property owners. Notably, although the Snyders argue that the Amended Complaint "allege[s] that they were singled out and treated differently than every other property owner located within geographic confines of the . . . Village," Appellants' Br. 36, they do not point to a single specific allegation in the Amended Complaint that references another property owner, let alone alleges that another property owner received more favorable treatment. Our case law does "not demand exact correlation," between Plaintiffs and a comparator to allege a class-of-one claim; however, it does require that the Amended Complaint put forward a comparator with "relevant similarit[ies]." *EJS Props.*, 698 F.3d at 864–65 (quoting *Perry v. McGinnis*, 209 F.3d 597, 601 (6th Cir. 2000)). The Snyders have offered none. Having failed to tether their class-of-one claim to any other property owner in the Village, the Snyders fall short of pleading an equal protection claim.

### 4. The Snyders' Due Process Claim

The Due Process Clause of the Fourteenth Amendment prohibits the "depriv[ation] . . . of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Due process comprises both procedural and substantive protections. *EJS Props.*, 698 F.3d at 855. However, the Snyders' appeal—and, therefore, our review—concerns only its substantive component.

Substantive due process protects a narrow class of interests, including those enumerated in the Constitution, those so rooted in the traditions of the people as to be ranked fundamental, and the interest in freedom from government actions that "shock the conscience." *Bell v. Ohio State Univ.*, 351 F.3d 240, 249–50 (6th Cir. 2003). However, "[w]here a particular Amendment provides an explicit textual source of constitutional protection' against a particular sort of government

behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." *Johnson v. City of Cincinnati*, 310 F.3d 484, 490–91 (6th Cir. 2002) (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)) (internal quotation marks omitted); *see also Montgomery v. Carter County*, 226 F.3d 758, 769 (6th Cir. 2000) (applying the principle to the Takings Clause); *Buckles v. Columbus Mun. Airport Auth.*, 90 F. App'x 927, 931 (6th Cir. 2004) ("Buckles's substantive due process claim fails because, where the Constitution specifically provides a remedy, as for the taking of real estate, a substantive due process claim that merely restates the more specific claim will not lie.").

On appeal, the Snyders concede that their substantive due process claim arises from the same transaction and occurrence as their takings claim, and, when pressed at oral argument, Plaintiffs counsel acknowledged that the Snyders' takings clause supersedes any more general, related due process claim. This resolves our due process inquiry.

**B.     The District Court's Denial of Plaintiffs' Motion to Alter and Amend**

Plaintiffs also appeal the district court's denial of their motion to alter and amend the judgment pursuant to Federal Rules of Civil Procedure 59(e) and 60(b). Such denials are reviewed for an abuse of discretion and any reversal requires that we have "a definite and firm conviction that the trial court committed a clear error of judgment." *Doe v. Lexington-Fayette Urb. Cnty. Gov't*, 407 F.3d 755, 760 (2005) (quoting *Davis v. Jellico Comm. Hosp., Inc.*, 912 F.2d 129, 133 (6th Cir. 1990)); *see also Nat'l Ecological Found. v. Alexander*, 496 F.3d 466, 476 (6th Cir. 2007).

Before the district court, Plaintiffs argued that testimony elicited at a September 21, 2023, necessity hearing constituted newly discovered evidence requiring the district court to set aside its judgment dismissing the case under Rule 59(e) and Rule 60(b)(2), and that allowing the judgment to remain in light of this testimony would constitute a manifest injustice requiring relief under Rule

60(b)(6)'s catch-all provision. This testimony, according to Plaintiffs, shows that: (1) the Village served its Notice of Intent to Acquire before knowing whether the Property's water was suitable for drinking; (2) the Village's rationale for taking the property was based on a speculative future need; (3) the Village had no timeline to begin constructing a public works project on the Property; (4) the Village had no understanding of the costs of constructing a public works project on the Property; (5) the Village's eventual good faith offer of $525,000 was not supported by any appraisal evidence; and (6) the Village became interested in taking the property only after Plaintiffs announced their intention to auction the property.

The district court denied Plaintiffs' motion in full. First, it reasoned that the testimony was neither newly discovered within Rule 59(e) and Rule 60(b)(2)'s meaning, nor material to a motion to dismiss. As the district court noted, Plaintiffs elicited the testimony at issue during a September 2023 necessity hearing and did not disclose that testimony to the district court until after the district court issued its memorandum opinion and order dismissing the case in February 2024; therefore, the testimony was not "newly discovered." Second, it rejected Plaintiffs' argument that the evidence required relief under Rule 60(b)(6) because it did not alter the court's analysis of Plaintiffs' substantive claims.

On appeal, Plaintiffs argue that the district court abused its discretion only in analyzing whether Rule 60(b)(2) and Rule 60(b)(6) warrant altering the judgment—not Rule 59(e). They summarily state the evidence was "new," and then argue the district should have consider the testimony because the testimony "confirmed and emphasized" the Village's misconduct. Appellants' Br. 42–43.

Plaintiffs' assertion that the evidence was "new" must be properly supported. Newly discovered evidence under Rule 60(b)(2) is evidence that "with reasonable diligence" could not

have been discovered prior to the judgment. *HDC, LLC v. City of Ann Arbor*, 675 F.3d 608, 614–15 (6th Cir. 2012). Here, Plaintiffs learned of the testimony in September 2023, while the district court was still considering the Village's motion to dismiss. Rather than move to file a seconded amended complaint or a sur-reply, Plaintiffs remained quiet until the district court ruled in February 2024. Accordingly, the testimony was not "newly discovered" within Rule 60(b)(2)'s meaning.

Rule 60(b)(6)'s catch-all provision applies only in exceptional or extraordinary circumstances not already addressed by the Rule's first five numbered clauses where the principles of equity mandate relief. *Ford Motor Co. v. Mustangs Unlimited, Inc.*, 487 F.3d 465, 468–69 (6th Cir. 2007). Plaintiffs' argument that the testimony substantiates its allegations that the Village engaged in misconduct does not fit this mold. For the reasons explained above, the Snyders' claims fail on their merits based on the allegations in the Amended Complaint—allegations presumed to be true when confronted with a 12(b)(6) motion. *See Hill*, 878 F.3d at 203. So, evidence suggesting that the Amended Complaint's allegations are true does not change the legal determination that the allegations fail to state a claim. Because the testimony brings Plaintiffs no closer to stating a plausible claim for relief, the principles of equity do not mandate relief under Rule 60(b)(6).

In sum, Plaintiffs have failed to demonstrate that the trial court committed a clear error of judgment in denying Plaintiffs' motion to alter and amend the judgment. Accordingly, we affirm the district court's decision to deny the motion.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the dismissal order and the denial of Plaintiffs' motion to alter and amend.

**CLAY, Circuit Judge, dissenting.** The Snyders allege that the Village engaged in a deliberate course of conduct to force the sale of private property at a reduced value, or alternatively, to acquire the property at a reduced value through condemnation proceedings after the Village's improper conduct reduced the property's value. The Snyders have not alleged that the Village's mere public expression of interest in the property diminished the property's value, as the majority would contend. *See* Majority Op. at 1, 13.

It is a clear abuse of the government's eminent domain power when a public entity, such as the Village of Luckey, Ohio ("the Village"), acts intentionally and in bad faith to devalue private property in an attempt to acquire it more cheaply in the future. After learning that the Snyders planned to auction their property to a developer, the Village immediately began plotting to thwart the auction and prevent the property from selling at a fair market value, but the Village had no "legitimate public purpose" in doing so. *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 455 (6th Cir. 2009). Although the Village expressed its intent to appropriate the property for use as a public water supply or park, such purported public purpose was apparently contrived, non-existent, and clearly pretextual.

Because the Snyders have alleged a "deliberate course of conduct" by the Village to manipulate the value of the property, resulting in the Snyders experiencing substantial financial loss, *Amen v. City of Dearborn*, 718 F.2d 789, 797 (6th Cir. 1983), they have stated a plausible claim under the Takings Clause. Although the Supreme Court has held on multiple occasions that a "depreciation in value of the property" because of the government's preliminary steps towards condemnation does not amount to an unconstitutional taking, *see, e.g. First Eng. Evangelical Lutheran Church of Glendale v. City of Los Angeles*, 482 U.S. 304, 320 (1987), this case features

intentional governmental wrongdoing and interference at a scale not addressed in those prior holdings. I therefore respectfully dissent.

## I. BACKGROUND

In 2005, the Snyders purchased a large tract of land in the Village of Luckey, Ohio, for $330,000 ("the property" or "subject property"). The property had previously functioned as a quarry, and the Snyders planned to develop it themselves or sell to a "high-end" developer. Am. Compl., R. 8, Page ID #108. With this goal in mind, the Snyders made a series of substantial improvements to the property over the next fifteen years, including but not limited to: "adding hundreds-of-thousands of yards of clean fill to improve topography and grading," "[e]stablishing electric and sanitary sewer service," clearing vegetation, maintaining the lake, and making "innumerable aesthetic improvements." *Id.* at Page ID #107. They eventually decided to sell the property, and in 2018, asked the Village whether it was interested in buying the property. The Village declined to purchase the property and did not make any offer to the Snyders.

In 2021, the Snyders entered an agreement with a real estate company, Beth Rose Real Estate and Auctions, LLC ("Beth Rose"), to auction and sell the property in exchange for a percentage of the sale proceeds. Beth Rose proceeded to spread the word about the upcoming property auction, which was scheduled for September 18, 2021, and "undertook significant time, effort, and expense in . . . promoting the subject property and the auction." *Id.* at Page ID #108. The Snyders and Beth Rose established a pre-auction reserve so that the property could not sell below a certain price threshold.

On or about August 4, 2021, the Village became aware of the Snyders' plan to auction the property and began a series of maneuvers to prevent this from happening. Various elected officials and other agents of the Village contacted the Snyders in an attempt to dissuade them from

auctioning the property. Then, on August 17, 2021, the Village held its regular council meeting and directed Attorney Corey Speweik, the Village Solicitor, to "begin the eminent domain process on [the property] for public purpose." *Id.* at Page ID #110. The Village did not provide any information on what the alleged "public purpose" would be for the Village's proposed taking of the property until a few days later, on August 20, 2021, when it issued its first Notice of Intent to Acquire, and identified the purpose of the appropriation as a "public water supply and/or park." *Id.* at Page ID #111. This alleged public purpose ran afoul of Ohio Revised Code Section 743.01, which expressly limited the Village's eminent domain power by mandating that any land taken "for water-works purposes shall not be used for any other purpose, except by authority of the director of public service and with consent of such legislative authority." *Id.* at Page ID #111.

The Village proceeded to undermine the Snyders' scheduled auction of the property by demanding that Beth Rose notify all bidders of the Village's intent to appropriate the property. On September 18, 2021, the day of the auction, the Village sent its representatives to the auction to prevent the sale of the property by dissuading others from bidding on the property and erecting physical barriers and "No Parking" signage to prevent access to the property. *Id.* at Page ID #114. Speweik had previously explained to Tim Snyder, one of the property's owners, that a successful auction would have hurt the Village's negotiating position, by forcing it to deal with a subsequent buyer and "spend[] more money" to purchase the property. Audio Recording, R. 8-8, at Page ID #166.

At the auction, the property received a maximum offer of $610,000 but failed to meet its reserve, and the Snyders retained title to the property. Beth Rose polled the registered bidders to inquire if the Village's behavior had negatively influenced their willingness to bid on the property, and the "vast majority" of bidders said that it had. Am. Compl., R. 8, Page ID #115. The Village

did not initiate appropriation proceedings against the Snyders until eighteen months later. As a result of the Village's behavior at the auction, the Snyders alleged that the property was left "completely unmarketable," since they could no longer sell the property "with the Village's actions serving as a cloud upon the title." *Id.* at Page ID #117.

On December 22, 2022, the Snyders and Beth Rose ("Plaintiffs") filed a complaint against the Village in the United States District Court for the Northern District of Ohio, alleging various constitutional violations under the Fifth and Fourteenth Amendments. The Village moved to dismiss the complaint, which prompted Plaintiffs to file their Amended Complaint. Plaintiffs alleged that the Village engaged in a "concerted pattern of conduct to impair [their] livelihood . . . to prevent the sale of the property, and to artificially lower the fair market value of the property to coerce [them] to sell the subject property to the Village" without just compensation, in violation of the Takings Clause. Am. Compl., R. 8, Page ID #118. On February 12, 2024, the district court dismissed Plaintiffs' claims, reasoning that the property's "alleged decrease in value . . . and [the Village's] hampering of [Plaintiffs'] ability to sell the property prior to the institution of appropriation proceedings" did not constitute a viable property interest under the Takings Clause. Order, R. 13, Page ID #287.

During the course of this litigation, the parties also attended a Necessity Hearing in the district court in September 2023, during which the Village offered new testimony regarding its intent to appropriate the property, thus forming the basis for Plaintiffs' motion to alter or amend the judgment pursuant to Federal Rules of Civil Procedure 59(e) and 60(b). During the Necessity Hearing, the Village's Mayor, Corey Panning, testified that the Village had not wanted to purchase the property until August 2021, when it first learned of the Snyders' intent to auction the property. Mayor Panning also testified that the Village had "[no] idea whether [the property] would be

suitable for a public water source" at that time, Hr'g Tr., R. 15-1, Page ID #380, as the Village had performed no survey of the property. *Id.* at Page ID #382 (adding that he did not know "what the requirements would be to have "parks and public water source[s] coexisting in the same space"). In addition, Panning testified that the Village had presented the Snyders with an offer to buy the property for $525,000 on September 21, 2022, based off an appraisal dated November 22, 2021, for $435,000 (roughly two months after the failed auction on September 18, 2021). Panning was unable to articulate a basis for the $525,000 number other than the appraisal document.

As of September 2023, Mayor Panning testified that little to no progress had been made on the Village's alleged plan to appropriate the property for a public water works. He explained that the Village did not have the funds necessary to proceed with the project (approximately $4 million dollars) and had taken no steps to secure it; had not engaged any contractors or engineers on the project; and had no timeline for starting or completing the project. Panning further testified that the Village still did not know whether the water on the property was contaminated from storm runoff, beryllium, or exposure to other heavy metals.

In light of this testimony at the Necessity Hearing, Plaintiffs filed a motion to alter or amend the district court's judgment pursuant to Federal Rules 59(e) and 60(b), on March 11, 2024, which the district court later denied. Plaintiffs allege that the district court improperly ignored this testimony due to the extraordinary circumstances at play.

The instant appeal followed.

## II. DISCUSSION

This Court reviews *de novo* a district court's grant of a motion to dismiss. *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012). "We must construe the complaint in the light most favorable to the plaintiff and accept all allegations as true." *Id.* (citing *Harbin-Bey v. Rutter*, 420

F.3d 571, 575 (6th Cir. 2005)). The Snyders allege that the district court erroneously dismissed their takings claim by failing to acknowledge "the undisputedly deliberate misconduct of the Village, . . . [to] destroy the fair market value of the subject property prior to the September 18, 2021, Auction." Appellants' Br., ECF No. 18, 27. The Snyders contend that the Village sabotaged the auction by alerting all potential bidders of the Village's intent to take the property, sending representatives to discourage bidding on the property, and blocking street access to the property, all in an attempt to "render [the property] unmarketable" so that the Village could more easily (and cheaply) take the property. *Id.* at 9. These actions were taken by the Village to impede the property's sale or reduce its marketability even though the Village had failed to properly assess or evaluate the property's suitability for any intended use by the Village. These deliberate actions by the Village, the Snyders allege, caused the auction to fall below its reserve and left the property "economically idle." *Id.* at 29. Although the property was not "taken" in the traditional sense, the Village's bad faith actions to lower and obfuscate the property's fair market value caused damage to the property such that Plaintiffs have stated a plausible takings claim.[1]

---

[1] Additionally, Plaintiff and Real Estate Company, Beth Rose, plausibly asserted standing in her takings claim against the Village. *Ass'n of Am. Physicians & Surgeons v. FDA*, 13 F.4th 531, 543–44 (6th Cir. 2021). Plaintiffs' Amended Complaint suggests that Beth Rose had a contractual interest in the auction proceeds from the sale of the Snyders' property. *See* R. 8, Page ID #108 ("Pursuant to the terms of the parties' agreement, Ms. Rose was to receive a commission on the sale price of the subject property."). The majority's contention that Beth Rose's theory of injury is insufficient for standing is incorrect. The Village's actions effectively destroyed the auction of the Snyders' property and rendered Beth Rose's contractual rights worthless, after Beth Rose had already undertaken significant efforts to market and sell the property in reliance on those contractual rights. The majority contends that Beth Rose fails to show sufficient traceability and redressability because "there is no guarantee that the property would sell above the reserve value." Majority Op. at 9. Although the sale of the property was never guaranteed, the Village's intentional efforts and wrongdoing foreclosed the chance at a sale that Beth Rose would have otherwise had in the absence of the government's sabotage. Such lost opportunity to earn a commission is a foreseeable result of the Village's actions. To deny her standing would permit the Village to intentionally frustrate private business arrangements without consequence, in conflict with the Fifth Amendment's protection of private property rights. *See Hall v. Meisner*,

The doctrine of eminent domain provides that the government may not take private property for public use "without just compensation." U.S. CONST. AMEND. V. This standard, defined as the "fair market value" of the property, entitles the property owner to receive "'what a willing buyer would pay in cash to a willing seller' at the time of the taking." *United States v. 564.54 Acres of Land, More or Less, Situated in Monroe and Pike Cntys.*, 441 U.S. 506, 511 (1979) (quoting *United States v. Miller*, 317 U.S. 369, 374 (1943)); 26 C.F.R. § 20.2031-1(b) ("The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of the relevant facts.").

In assessing whether a taking occurred under the Fifth Amendment, we look at several factors including: (1) the "economic impact of the regulation," (2) "the extent to which the regulation has interfered with distinct investment-backed expectations," and (3) "the character of the governmental action." *Penn Central Transportation Company v. New York City*, 438 U.S. 104, 124 (1978). A taking "may more readily be found" when the interference with property "lacks a legitimate public purpose." *Tenn. Scrap Recyclers Ass'n v. Bredesen*, 556 F.3d 442, 455 (6th Cir. 2009) (citing *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 485–86 (1987)).

The Snyders allege that the Village's intentional and concerted efforts to thwart the auction sale of the property resulted in a decrease in economic value, although the precise "economic impact" of the Village's actions are unclear (and due to the Village's intentional sabotage and questionable appraisal techniques, cannot be easily ascertained). *Penn Central*, 438 U.S. at 124. They also allege that this devaluation interfered with their plans to develop the property or sell to

---

51 F.4th 185, 190 (6th Cir. 2022) (opining that "the Takings Clause would be a dead letter if a state could simply exclude from its definition of property any interest that the state wished to take").

a developer, since they could not sell the property "with the Village's actions serving as a cloud upon the title." Am. Compl., R. 8, Page ID #117.

Notably, in attempting to acquire ownership of the Snyders' property, the Village purportedly intended to use the property as a public park or water source, but the evidence demonstrates that the Village actually had no "legitimate public purpose" whatsoever, which the majority fails to address. *See Tenn. Scrap Recyclers Ass'n*, 556 F.3d at 455 (citing *Keystone Bituminous Coal Ass'n*, 480 U.S. at 485–86). In 2018, the Snyders initially asked the Village whether it would like to buy the property, and the Village declined and made no offer to the Snyders. Only after the Village became aware of the Snyders' plan to auction the property in August 2021 did the Village take a series of actions intentionally designed to interfere with the sale and deprive the Snyders of their ownership of the property. It is true that the Village could acquire the property by eminent domain if it had a public purpose for its use, but the record demonstrates that the Village did not actually have a sincere interest in acquiring the property for any legitimate public purpose. The Village purported, when it issued its first Notice of Intent to Acquire, that the purpose of the appropriation was to use the property as a "public water supply and/or park." Am. Compl., R. 8, Page ID #111. More than two years later, on September 21, 2023, Mayor Panning clarified that the Village intended to use the property solely as a public water system, but was "unsure" whether the proposed water system could also be combined with a park. Hr'g Tr., R. 15-1, Page ID #384. The Village never financed, planned, engineered, appraised, tested, or took any other conceivable action in furtherance of this purpose. This purported public purpose appears even more suspect considering that Ohio law prevented the Village from acquiring land "for water-works purposes" and also combining it with another purpose, and the Village did

not obtain permission from the relevant authorities to deviate from this rule. Am. Compl., R. 8, Page ID #111. In other words, the Village's purported public purpose was a sham.

The Village does not have and has never had an actual plan to use the property for a public water system. Prior to August 2021, the Village did not have "even an inkling of a plan" to use the property as a public water system. Hr'g Tr., R. 15-1, Page ID #362–63. The Village had not surveyed the property or even hired a surveyor. The Village had not acquired funding for the property's development as a public water source or established any timeline for the project. It had not hired an engineer (or any other individual) to perform a feasibility study to see whether the property could even "support a public water source," Hr'g Tr., R. 15-1, Page ID #339, and had no future plans to do so. Concerningly, it had not conducted any tests to see if "contamination" from the property across the street—which had been previously used as a wheel factory—would render the drinking water unsafe.[2] *Id.* at Page ID #337.

As of September 23, 2023, more than two years after sabotaging the auction, the Village still had not determined whether the water on the property was suitable for drinking.[3] It still had not "engaged or even contemplated" engaging any contractors to work on the property. *Id.* at Page ID #363. It still had not set a timeline for the project, or "taken any steps to secure" the $4 million dollar funding that it claimed was necessary to build a water treatment plant on the property. *Id.* Remarkably, Mayor Panning was "unsure" whether the Village even needed the property for a

---

[2] The Village conducted a single water test of the Snyders' property on September 1, 2021, but did not test the soil, survey the property, or otherwise perform any feasibility study to determine whether the property could actually "support a public water source." Hr'g Tr., R. 15-1, Page ID #339.

[3] The Village's considerable delay in implementing a public water system on the property (and apparent failure to take any steps that further this goal) further supports the Snyders' claim that the Village's alleged public purpose of a "public water supply and/or park" was pretextual. Notice of Intent to Acquire, R. 8-5, Page ID #153.

public water system at all, *id.* at Page ID #367, and also could not answer whether the project would be completed in ten years, twenty years, or *ever*. For these reasons, the Village's alleged public use as a "public water supply and/or park" was clearly a prevarication. Notice of Intent to Acquire, R. 8-5, Page ID #153; *see also Amen*, 718 F.2d at 798 ("[A] taking will be nullified as not being for a public purpose when it is demonstrated that the public entity acted in an arbitrary manner or in bad faith.").

Under these circumstances where the Village "lacks a legitimate public purpose," an unconstitutional taking is "more readily found." *Tenn. Scrap Recyclers Ass'n*, 556 F.3d at 455 (citing *Keystone Bituminous Coal Ass'n*, 480 U.S. at 485–86) (citation modified). It is well-settled law that the government may take private land only for a public purpose. *Kelo v. City of New London*, 545 U.S. 469, 477–78 (2005). Although *Kelo v. City of New London* upheld broad definitions of "public use," it did not foreclose challenges to government action that is pretextual or non-legitimate, as is the case here. 545 U.S. at 478–79 (noting that the government may not "take property under the mere pretext of a public purpose").

What further distinguishes the Snyders' claim from a traditional takings claim, and tips the balance strongly in their favor, is the egregious "character of the [Village's] action[s]" in attempting to depress the property's value and prevent its sale. *Penn Central*, 438 U.S. at 124. Although the district court noted in dismissing Plaintiffs' claims that the property did not officially "change[] hands" and the Village did not "refuse[] to pay for the acquisition of the property," Order, R. 13, Page ID #286, the record shows that the Village made a series of purposeful maneuvers to sabotage the sale, devalue the property, and acquire it more cheaply, all without a legitimate public purpose, thereby robbing the Snyders of their right to sell the property at fair market value.

A government actor's intentional or bad faith conduct can clearly support a takings claim, especially when the conduct is designed to force a sale or acquire property more cheaply. *See Amen*, 718 F.2d at 798. For instance, we held in *Amen v. City of Dearborn* that the City of Dearborn's "deliberate course of conduct" to deny repair permits, require excessive repairs, and leave blighted homes unattended (among other acts), was so disruptive to the plaintiffs' enjoyment of their properties that it essentially forced them to sell at a reduced value, and amounted to an unconstitutional taking. *Id.* at 797; *see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 333 (2002) (suggesting that "bad faith" actions by a government entity during its appropriation of private property can give rise to a takings claim). Because the City of Dearborn's purposeful actions caused "substantial damage" to the plaintiffs' properties in *Amen*, we held that the properties were "actually taken within the meaning of the fifth and fourteenth amendments," and that just compensation was due. 718 F.2d at 798. We also noted "[t]he unfairness" of the City's appraisal technique in *Amen*, which used nearby comparable property as a metric to gauge the fair market value of the plaintiffs' properties. 718 F.2d at 799. Because the City's own actions had caused these "comparable" properties to suffer from a similar drop in economic value, the City's appraisal of plaintiffs' properties was "based upon factors which inherently produced an artificially low market value." *Id.*

In similar fashion, the Village engaged in a "deliberate course of conduct" to suppress the value of the Snyders' property and force its sale by: (1) notifying all auction bidders of the Village's intent to acquire the property, (2) sending representatives to the auction to dissuade bidding on the property, and (3) erecting "No Parking" signage and barriers to physically prevent bidders from accessing the property. Am. Compl., R. 8, Page ID #114. These tactics were

obviously successful.[4] At the conclusion of the auction, a poll of registered bidders revealed that "[t]he vast majority [of bidders], if not all, . . . indicated that the Village's actions . . . prevent[ed] them from bidding on the subject property." *Id.* at #115. Notably, the Village itself had no interest in bidding at the auction, and did not do so; it simply aspired to chill bidding activity to avoid "spending more money" on its eventual acquisition of the property. Audio Recording, R. 8-8, Page ID #166.

This is also reinforced by the Village's glaringly unfair appraisal strategy, which followed its elaborate subterfuge and formed the basis for the Village's "good faith" offer to buy the property for $525,000. The Village's appraisal of the Snyders' property, dated November 22, 2021, took place roughly two months after the Village's intentional sabotage of the auction, and valued the property at $435,000. It is far from clear what information factored into this $435,000 appraisal of the property. It is also a mystery how the Village arrived at its "good faith" offer of $525,000. Even Mayor Panning could not articulate any basis for the Village's $525,000 figure other than the Village's discussions with council, and Panning did not base his testimony on any documents other than the appraisal document itself. Panning further testified that "[no]body on the council [had] a background in real estate appraisals," and that no other appraisers were consulted. Hr'g Tr., R. 15-1, Page ID #328. Additionally, the November 2021 appraisal was no longer current at the time the Village made its "good faith" offer to the Snyders in September 2022, almost one year later.

---

[4] The Village attempts to argue that the auction would not have failed had Plaintiffs not set a pre-auction reserve. This argument is entirely unpersuasive, as it seemingly suggests that Plaintiffs should have been willing (or even forced) to accept a below-market offer, and that their refusal to do so was somehow their own shortcoming.

Of course, the Village could have appraised the property before sabotaging the auction and obscuring the property's fair market value, but it did not. Am. Compl., R. 8, Page ID #112 (noting that "the Village did not have a good faith offer to provide the Plaintiffs and that no appraisal or valuation [of the property] had been performed by September 15, 2021," three days before the auction). Instead, the Village waited to appraise the property until *after* it had already tanked the September 18, 2021, auction in order to prevent the bidding from revealing the actual value of the property. As a result, the Village's subsequent appraisal and offer were both "based upon factors which inherently produced an artificially low market value" for the subject property. *Amen*, 718 F.2d at 799. And because of the Village's concerted efforts to suppress the property's true value, "it is difficult to ascertain how [the Snyders] could have received the fair market value of [their] property at the time of the taking." *Id.* at 800.

The majority attempts to avoid *Amen v. City of Dearborn* for a few reasons, none of which are persuasive. The majority highlights that *Amen* involved a "years-long campaign of conduct that demonstrably and intentionally lowered property values." Majority Op. at 15. Although the Village engaged in intentional wrongdoing over a shorter period than the government did in *Amen*, *Amen* states no requirement that the government's actions must occur over the course of many years in order for a "deliberate course of conduct" to amount to an unconstitutional taking. *See* 718 F.2d at 798. Further, although the "substantial damage" in *Amen* involved physical degradation to the plaintiffs' homes and neighborhood, *Amen* also states no requirement that physical degradation must occur on a property in order for a government's "deliberate course of conduct" to amount to an unconstitutional taking of the property. *See id.* Rather, *Amen* requires only that the government's "deliberate course of conduct" cause "substantial damage," and the

Village's concerted and intentional efforts to acquire ownership of the property certainly caused "substantial damage" to the value of the property in this case. *See id.*

The majority also emphasizes that in *Amen* the government "chose not to invoke its condemnation powers, but, rather, elected to engage in a deliberate course of conduct to force the sale of private property at a reduced value." Majority Op. at 15; 718 F.2d at 797. But the Village did not properly invoke its condemnation powers in this case either. As already discussed, the government may invoke its condemnation powers and take private land only for a legitimate public purpose. *See Kelo*, 545 U.S. at 477–78; *see also Tenn. Scrap Recyclers Ass'n*, 556 F.3d at 455. The Village had no legitimate public purpose in purporting to invoke its condemnation powers. Just as the government in *Amen* engaged in a "deliberate course of conduct to force the sale of private property at a reduced value," 718 F.2d at 797, so too did the Village in this case.

In contending that *Amen* does not apply to this case, the majority opinion reflects a fundamental misunderstanding of the Snyders' claim. The majority states that the Snyders' allegations indicate that "they have a right to test the value of the Property at a private auction in advance of any government action." Majority Op. at 15. Certainly, "the Fifth Amendment . . . does not guarantee [a property owner] a return of his investment." *United States ex rel. and for Use of Tenn. Valley Auth. v. Powelson*, 319 U.S. 266, 285 (1943). But, contrary to the majority's argument, the Snyders do not claim that they are entitled to a guaranteed return on their investment in their property. Rather, the Snyders allege that the Village engaged in a deliberate course of conduct to force the sale of private property at a reduced value, or alternatively, to acquire the property at a reduced value through condemnation proceedings after the Village's improper conduct reduced the property's value. Such conduct is precisely the sort of government action that *Amen* prohibits.

In concluding that no taking occurred, the majority highlights the Supreme Court's holdings that a "depreciation in value of the property" because of the government's preliminary steps towards condemnation does not amount to an unconstitutional taking. *See, e.g. First Eng. Evangelical Lutheran Church of Glendale*, 482 U.S. at 320. To this point, the majority also relies on *Agins v. City of Tiburon*, wherein the Supreme Court held that a city's zoning ordinances that allegedly destroyed the value of the plaintiffs' property did not constitute an unconstitutional taking. *See* 447 U.S. 255, 258, 263 (1980). The majority cites *Agins* in stating that "where the fair market value of a property declines as a result of a city's announcement of its intention to condemn that property, no taking occurs" and that "mere fluctuations in value during the process of governmental decision making" are just "incidents of ownership." Majority Op. at 11. But the majority's reliance on these cases is unfounded, as none of these cases feature governmental wrongdoing and interference at the scale present in this case.

Invoking these cases, the majority mischaracterizes the Village's ongoing efforts to acquire ownership of the property, including its intentional wrongdoing and deliberate sabotage of the property's sale, as the Village's mere "expressed interest" in the property. *See* Majority Op. at 13. But the Village did not provide only an announcement or simply express interest in the property. Nor did the Village follow the normal process of governmental decision making or take standard preliminary steps towards a condemnation. Rather, the Village carried out an intentional and concerted series of actions to undermine the sale of the property, devalue the property, and acquire ownership of the property at a cheaper price. The Village's course of conduct involving intentional wrongdoing and interference sets this case apart from those prior holdings.

Moreover, this case does not involve "mere fluctuations in value," *see Agins*, 447 U.S. at 263 n.9, which any property owner could certainly expect. Prior to the auction, the Snyders

invested significant financial resources and time in making substantial improvements to their property over the course of fifteen years. After fifteen years of efforts to improve their property in advance of the auction, the Village's intentional wrongdoing and interference with the auction precluded the Snyders from ever receiving a fair price for their property. Such damage to the property's value was not an "incident of ownership" resulting from a typical governmental process. *See id.*

Additionally, the Supreme Court recognized in *Agins* that the ordinances at issue "substantially advance legitimate government goals," and such "governmental purposes long have been recognized as legitimate." *Id.* at 261. As already demonstrated, however, no legitimate public purpose supports the Village's actions here. Therefore, *Agins* and similar cases serve as no barrier to the Snyders' takings claim. Such obvious and substantial diminishment in the property's value because of the Village's intentional wrongdoing is sufficient to support a takings claim at the pleading stage, particularly where the Village lacked a legitimate public purpose. *Tenn. Scrap Recyclers Ass'n*, 556 F.3d at 455 (citing *Keystone Bituminous Coal Ass'n*, 480 U.S. at 485–86); *see also Penn Central*, 438 U.S. at 124.

Moreover, it is precisely because of the Village's alleged intentional wrongdoing that it is impossible to ascertain the extent of the damage to the property's value at this stage. The majority's discussion of the property's value is wholly speculative. The majority highlights that the property received a $610,000 bid, but that does not absolve the Village of culpability in this case. Even if that amount is nearly twice the purchase price, that bid provides no indication of the property's actual value. Presumably, the value of the property increased in line with the market from the time that the Synders purchased the property in 2005 to the time that the auction occurred in 2021. In the meantime, the Snyders also invested fifteen years' worth of substantial improvements into the

property, which further increased the property's value. Because of the Village's efforts to undermine the sale, devalue the property, and acquire it at a cheaper price, we do not know (1) what the value of the property would have been if the Village had not sabotaged the auction, and (2) if unsold at the auction, what the value of the property would be if it were otherwise sold in a real estate transaction. In other words, all we know at this stage is that the Village allegedly committed a series of actions that amounted to intentional wrongdoing, which substantially diminished the value of the property at an amount not easily ascertainable because of those concerted governmental efforts. The Snyders have thus offered sufficient plausible allegations at the pleading stage to entitle them to commence discovery, wherein questions such as the loss of property value or the existence of a legitimate public purpose may be explored.

## III. CONCLUSION

Because the Village's actions amounted to an intentional devaluation of the Snyders' property without a legitimate public purpose, the Snyders have stated a takings claim sufficient to withstand dismissal under Rule 12(b)(6). The totality of these extraordinary and unusual circumstances, including the testimony elicited from the Village at the September 2023 Necessity Hearing, also warrant the granting of Plaintiffs' motion to alter and amend the district court's judgment to prevent a manifest injustice. Fed. R. Civ. P. 60(b) (authorizing relief from a judgment or order for "any other reason that justifies relief"). I therefore respectfully dissent.